MIAMI CYCLE & MFG. CO. v. ROBINSON.

(Circuit Court of Appeals, Sixth Circuit.  August 1, 1917.  On Motion for Rehearing, October 11, 1917.)

No. 3009.

1. PATENTS ⊙⇒212(1)—LICENSES—SUIT FOR ROYALTIES.
    The fact that a complainant, who had contracted to grant to defendant an exclusive license under a pending application for a patent, refused to execute a formal license, although without justification, *held* not to bar a suit for royalties under the patent after issuance, where up to the time of such issuance the failure to execute the license was immaterial, and was waived by defendant, and thereafter the parties treated the contract as still in force in other respects, and as in effect a license.

2. CONTRACTS ⊙⇒316(5)—BREACH—WAIVER.
    The action of a defendant in demanding further performance of a contract after its breach by complainant *held* to be a waiver of the right to treat such breach as ending the contract.

3. PATENTS ⊙⇒211(1)—EXCLUSIVE LICENSE—REISSUE.
    An exclusive licensee is not bound by the narrow construction which the patentee puts upon his claims for the sake of getting a reissue, and when

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the original claims are repeated in the reissue, the licensee may have them construed as broadly as they would have been in the original.

**4.** PATENTS ⊜⊐211(3)—LICENSE—CONSTRUCTION.

When applicant and licensee have dealt upon the theory that pending claims, if allowed, would cover the licensee's product, the licensee may not, after the patent issues with these claims, deny liability thereunder.

**5.** PATENTS ⊜⊐211(2)—LICENSE—SUIT FOR ROYALTIES—DEFENSES.

Where a license contract required the payment of royalties, such royalties to cease and determine in the event the patent should be adjudged invalid, the licensee cannot set up the invalidity of the patent as a defense to a suit for royalties.

**6.** PATENTS ⊜⊐211(1)—LICENSE CONTRACT—CONSTRUCTION—ROYALTIES.

At a time when an application for a patent was in interference with others, the applicant made a contract to grant an exclusive license thereunder, which provided that "upon the issue of the final award of priority in favor of" the applicant the licensee should pay a royalty on such of its manufactures "as are covered by said patent." After the patent issued a reissue was applied for and obtained. *Held* that no royalties became due and payable until the date of the reissue, since until that time it could not be determined what was covered by the patent, but that the royalty period dated back to the specified final award.

**7.** PATENTS ⊜⊐219(4)—LICENSES—SUIT FOR ROYALTIES—CROSS-SUIT.

In a suit brought to recover royalties under a contract for an exclusive license, which provided that the royalty should "cease and determine in the event that a court of competent jurisdiction shall declare said patent * * * null and void," the defendant may properly be permitted by answer, under equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), to raise the issue of validity, not for the purpose of avoiding payment of royalties accrued, but of obtaining a decree terminating the contract.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Suit in equity by William Robinson against the Miami Cycle & Manufacturing Company. Decree for complainant, and defendant appeals. Reversed.

July 6, 1908, Robinson, the appellee, was the owner of three patents, and of the inventions covered by six pending applications for patent, all relating to coaster brakes for bicycles or other more or less analogous features. The appellant, hereinafter called the company, was manufacturing coaster brakes pursuant to the O'Horo patent, No. 860,234, of July 16, 1907 (reissued September 28, 1909, No. 13,023). Robinson's earliest application (hereinafter called the basic one) had been pending since October 8, 1897. The company's attorneys saw, in one of the issued Robinson patents, some reference to this early application, and so were led into communication with him. It was found that this invention was of such character as to make it likely that he would be entitled to claims broad enough to dominate the entire coaster brake art and to reach all the forms then being put on the market by several manufacturers; but that application was tied up in interferences. Negotiations were had, which resulted in the execution of a written contract between the company and Robinson, made July 6, 1908. Certain specially important provisions are copied in the margin;[1] but the substance of the whole contract was that Robinson was to assign to the company all his patents and inven-

---

[1] 8. Upon the formal transfer by Robinson of the title of all of Robinson's inventions, applications and patents, as recited above (with the exception of application serial No. 654,532, filed October 8, 1897), and the formal transfer of an exclusive license under the application filed October 8, 1897, the Cycle Company will pay to Robinson the following considerations, to wit: (a) Two thousand five hundred dollars ($2,500) cash; (b) a formal order for the

tions, except the basic application, and under that one he was to give the company an exclusive license; that the company, by its attorneys, should take over the prosecution of the pending applications and interference cases, and prosecute them all at its expense; that the company should presently pay Robinson $12,500 in stock and cash; that when Robinson was awarded the broad invention, as was expected, the company should pay him a license fee of 10 cents per brake, with minimum annual payments of $5,000, until he should receive $20,000 in royalties, whereupon the title to the broad patent should be assigned to the company, subject to further royalty payments and certain contingencies. The patent upon the basic application issued on July 8, 1913, No. 1,067,230, and reissued February 17, 1914, No. 13,690. Controversies between the parties finally resulted in the filing of this bill in the court

---

transfer to Robinson by the Cycle Company of 100 shares of the stock of the Cycle Company, which stock has a par value of $100 per share.

9. Upon the issue of the final award of priority in favor of Robinson in interference proceedings in the matter of the application of October 8, 1897, serial No. 654,532, in which Robinson is involved with other contestants, the Cycle Company agrees to pay to Robinson under the terms of the exclusive license recited in paragraph 8, a royalty fee of ten (10) cents upon such coaster brakes made by or for the Cycle Company as are covered by said patent, such royalty to cease and determine in the event that a court of competent jurisdiction shall declare said patent to be obtained null and void.

10. From and after the final award recited in paragraph 9, and unless the application and patent is declared invalid as recited in paragraph 9, the Cycle Company covenants and agrees to pay to Robinson, as a minimum yearly royalty, the sum of five thousand dollars ($5,000), payable quarterly.

15. The exclusive license given the Cycle Company by Robinson under the application of October 8, 1897, and patent to be obtained, is to continue so long as the Cycle Company complies faithfully with the terms of this agreement.

16. Upon the payment by the Cycle Company to Robinson of royalty fees under the application of October 8, 1897, and patent to be obtained, amounting to a total sum of twenty thousand dollars ($20,000), then Robinson hereby agrees to assign to the Cycle Company the entire title therein, subject, however, to the continuance of royalties thereunder as recited in paragraph 9.

17. The Cycle Company has the right to license others under any of the Robinson inventions, applications and patents upon the payment by the Cycle Company to Robinson of half the license fee so exacted.

18. Robinson agrees to join the Cycle Company in any action in or out of the Patent Office or in the courts which may be necessary to enforce the payment of royalties by others, or for the accounting for past profits or damages, at the expense of the company.

20. The Cycle Company agrees to use its best endeavors to collect all royalties which are or may be due under the Robinson inventions, applications and patents at the expense of the Cycle Company, and such net sums or their equivalent as may be collected thereunder shall be equally divided by Robinson and the Cycle Company.

21. The Cycle Company agrees to engage counsel at its own expense to conduct all proceedings under the Robinson patents, inventions and applications in the Patent Office and before the courts, and Robinson agrees to the retaining of such counsel in securing and maintaining their validity at the expense of the Cycle Company.

22. If the Cycle Company shall at any time cease to manufacture with due diligence marketable hubs covered by any of the Robinson patents, or shall discontinue, through failure or other cause, to do business, then the Robinson patents shall be reconveyed to Robinson without compensation or prejudice.

23. The Cycle Company shall be empowered to enter into trade relations with other manufacturers looking toward the establishment of satisfactory prices and the control of the coaster brake business of the United States, with a view of securing to both parties to this agreement the maximum amount of royalty fees attainable.

below. It prayed disclosure of the number of brakes manufactured by the company or its licensees and asked a decree for the minimum royalties due, and also certain other relief. The company answered, proofs were taken, and, on final hearing, a decree was made finding minimum royalties and interest thereon due, and directing immediate payment thereof, amounting to about $20,000, and making a reference to a master to ascertain the number of brakes made which were within the contract, and thus to learn whether royalties were due in excess of the minimum. The company brings this appeal.

Walter B. Grant, of Boston, Mass., and Fenelon B. Brock, of Washington, D. C., for appellant.

Leonard Garver, Jr., of Cincinnati, Ohio, and John M. Coit, of Washington, D. C., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). 1. Whether the bill states a case for which there is no adequate remedy at law may be matter of grave doubt. However, it undertakes to rest upon certain established grounds of equitable jurisdiction; and although the defendant challenged that jurisdiction below, it has assigned no error upon the overruling of its objection. Under these circumstances, we find no occasion to look into the question.

[1] 2. The first defense, in order of presentation, is that Robinson cannot enforce the contract, because he has never granted the exclusive license which he agreed to give. Further statement of facts here becomes necessary. Robinson was an inventor and patent solicitor of large experience. He had been conducting his own cases. After his original application had been long tied up in interferences, he devised the plan of filing what he called a divisional application, thinking, apparently, that he could thereby proceed, free in some respects from the complications which the interferences had brought about. Accordingly, in June, 1905, he filed this divisional application. It consisted of a copy of the specification and drawing and some of the claims of the original. In July, 1908, the Patent Office had repeatedly refused to give consideration on the merits, such refusal being for the reason that there was nothing truly divisional about it; and Robinson was insisting, both that it did contain claims not allowable under the basic application, and that the claims common to it and the former might eventually be assigned to one or the other, as the Office might direct. The contract of July 6, 1908, included this divisional application among the list of eight patents and applications which were to be assigned to the company. Immediately upon the signing of the contract, an assignment was prepared covering these eight, and the paper was executed and delivered. The contemplated exclusive license under the basic application not being entirely finished that day, it was arranged that Robinson would go home, and this paper would be sent to him the next day, and he would sign and return it. It was so prepared and sent. He declined to execute it, saying that, the moment the company's attorneys were in charge of the applications, they could transfer the broad claims from the basic to the divisional, to which the complete title had already passed, and so could defeat the purpose of the contract; he therefore asked that the divisional

be reassigned to him, whereupon he would include both the original and divisional in his license. This request was neither granted nor refused, but consideration was postponed. During all the years while the application was pending, and after the patent issued, there were occasional references by both parties to their respective positions on this subject, but there never was a positive demand for the license made as a condition of continuing the contract in force nor was there an absolute refusal to give it; but the company proceeded with the prosecution of the matter in a manner wholly inconsistent with any intention to claim forfeiture for lack of this instrument.

Robinson's original refusal to execute the license was unjustified. It amounted to saying that, although he had executed a contract in which there was neither fraud nor mutual mistake, he would not carry it out because he had later observed that he had left open one possible door by which the other party, if so disposed, might attempt to defraud him. All must agree that to transfer the broad claims to the divisional application, for the purpose and with the effect he feared, would have been to attempt a fraud upon him of which no reputable attorney would have been guilty, which he had no reason to apprehend, and which could not have been successfully carried out. It is true that the attorneys continued Robinson's efforts to get some broad claims allowed in the divisional case, but there is no reason to think that this was with any fraudulent intention; and it is true, also, that after Robinson ousted them from management of the basic case, in June, 1913, they threatened to misuse their power over the divisional; but they never tried to do so, and the threat was measurably, if not quite, justified as a matter of self-defense against Robinson's misconduct. Further, in so far as the divisional application, in July, 1908, supported or could thereafter be made to support details of form rightly separable from the basic claims, it was within the fair intent of the parties that such divisional matter should be included in that which was being absolutely transferred to the company. The substance of the arrangement was that the company presently became absolute owner of all subsidiary inventions [2] and exclusive licensee of the basic one. The company could rightfully have insisted upon the immediate execution of the license as agreed. However, the divisional application then contained nothing which the Patent Office considered properly divisional. Whether it might thereafter be made to do so was wholly contingent and rather improbable, and there is apparently no very substantial reason why the company might not have complied with Robinson's request. Both parties were content to let the matter of reassignment to Robinson drift along. It was not important while the interference made everything contingent; and later, after the patent issued, there was no possibility that the broad claims could be transferred to the divisional, and the latter was either negligible, because there was nothing left in it, or else it belonged to the company, because containing something rightly separable from the basic appli-

[2] Subject to a reverter clause (paragraph 22), which is rather incomprehensible, if it is intended to apply to the inventions assigned and in the use of which by the company Robinson had no apparent interest.

cation. Probably there was nothing left, because it was allowed to die. Certainly since the patent issued, the existence of legal title in the company to the divisional application has not afforded even a plausible pretext for not executing the formal license for the basic invention.

Merely as between the parties, and until the patent issued, there was no particular necessity for the formal license nor any prejudice to the company from its nonexecution. The contract of July 8th fixed the rights of the parties; and not until the patent issued could such a formal instrument have been of any value to the company for the purpose of enabling it to license others. Any such licenses to others could not be effectively granted before the issuing of the patent, and if the company desired to make contracts that it would license others when the patent was obtained, it could· make those contracts as well on the basis of the contract of July 8th as upon a more technical basis. It follows that Robinson's conduct, in not giving the formal license up to the time when the patent issued, cannot be considered a substantial or material breach which justifies the company in denying its contract liability. After the patent originally issued, the company never took the position that the failure to give the license had ended its rights and liabilities under the contract. When Robinson, in October, 1913, claimed that the company had broken the contract and forfeited all rights, and so demanded a reassignment of everything, the company responded:

"If you propose to treat the agreement as having been broken, we will be compelled to take proper steps to·put us in the position we both were in prior to the date of the agreement. Has the reissue been granted?"

Robinson then dropped the subject until, in December, 1913, he demanded royalty. The attorneys for the company replied that the contract had been broken by Robinson by his personal interference in the issue of the original patent and by his application for reissue, and that, because of this repudiation by Robinson in these two particulars, they had advised the company to turn everything back to him, if certain compensations could be agreed upon; but this termination of contract rights was tentative, and based expressly on grounds other than the failure to execute the license. The company made no demand for this formal license until and unless by its letter of April 1, 1914 (after the reissue), in which it said, in reply to a further demand for royalty payments:

"Dr. Robinson's contract has not yet been executed upon his part. He has failed to execute and forward to us the exclusive license under the 1897 application, including the right to license others. Are you ready to forward that license?"

To this Robinson's attorneys replied that the original contract itself sufficiently gave the license. After further correspondence, and demands to know the number of the coaster brakes manufactured, etc., the company's attorney answered, on April 27, 1914:

"I cannot well answer the questions raised by your letter, until we ascertain from you whether you are ready to turn over to us an exclusive license under the 1897 application and in accordance with the terms of the contract."

To this Robinson's attorney answered:

"If the Robinson-Miami contract is valid and in force, Dr. Robinson has certain rights thereunder, regardless of whether or not he gives the Miami Company an exclusive license under its 1897 application. I now assume that you will stand on your contention that the contract is null and void, and that the Miami Company does not intend to comply with any of the terms thereof."

Thereupon the bill of complaint was filed. It is clear enough that any breach on Robinson's part by his failure to execute the formal license, and in so far as such breach might justify repudiation of the whole contract by the company, had been waived by the company, and that, down to the date of filing the bill, it was bound to accept such license, if tendered.

In this situation, the execution of the license cannot be considered a condition precedent to the accruing of any royalty liability; but we do not think it was an immaterial condition, nor one which Robinson was not bound to perform. An essential part of what the company was buying was the right to control the situation by licensing other manufacturers (paragraph 17). It would be natural to include a provision to that effect in the formal license contemplated by paragraph 8, and this was done in the form of license drafted at the time, and to which form Robinson made no objection. It was also provided (paragraph 18) that, under the terms of this exclusive license, Robinson would join in any infringement suits which it might be necessary to bring to enforce the monopoly. It was plainly contemplated that upon the issue of the patent there should be a formal instrument given to the company, evidencing these rights, which could be placed upon record and upon the basis of which the company could deal with others without the necessity of resorting to all the conditions and complications of the original contract; and when Robinson came into a court of equity, it was his duty (as it had been since the issue) to tender to the company, before filing the bill or in the bill, such a formal exclusive license.

The bill did not allege or make such a tender, nor expressly touch this subject-matter; but the whole theory of its filing and maintenance necessarily implies that the company had received a sufficient license to satisfy the contract. It refers to the original contract as an "agreement and license"; and, taken altogether, it is a clear declaration that the company is vested with all the rights as exclusive licensee to which it was entitled under the contract. The answer, among other defenses, alleges the failure to execute the formal license, but it counts substantially upon Robinson's original refusal to do so in 1908. Although it alleges that the refusal continued down to the filing of the answer, yet it does not allege any willingness to accept, nor present any distinct theory of defense on this ground, excepting the continuing breach of the contract by the continuing effect of Robinson's original refusal; and we have seen that this original refusal was at the time immaterial and was waived by the company. In this situation, Robinson's suit should not fail merely because he had not executed the formal license nor because he did not offer to do so in his bill of complaint; but any decree in his favor based upon the contract, should be conditional upon his performance of his part thereof

in the matter of execution of this license. Such prejudice as there has been to the company for lack of earlier execution can be taken care of as hereafter indicated.

[2] 3. The next defense relates to the issue of the patent. After the delays caused by the interferences had ended in the manner hereafter stated, Robinson asked the attorneys to have the patent issued at once. They replied that they needed some considerable time for complete study of the state of the art, in order to shape the claims broadly enough to give the desired monopoly, but not too broadly to be valid. Losing patience, he went to the Patent Office, canceled all the pending claims which had not been allowed, paid the final fee, and directed immediate issuance. Here, again, Robinson clearly broke his contract. It had been stipulated that the conduct of the application was to be under the control of the company's attorneys. This had been their reasonable demand, agreed to by Robinson. His reasons now given for his conduct do not justify it. During the years the interferences had been pending, amendments and reshaping of the claims could not be allowed. The days of time and study required to secure the most perfect formulation would have been wasted if the interference was lost, and would have become at any time unavailing by the discovery of new references. The attorneys were justified in not having made this preparation while the interferences were on hand, nor could it rightly be made in a few hours, as Robinson seemed to think. On this ground, again, the company could have refused to proceed further with the contract; but it did not take this course. Its attorneys arranged with Robinson to join in trying to recall the case from issue and get further time for amendment, and, although the Patent Office would give only two weeks the attorneys accepted this situation and co-operated with Robinson in formulating and securing four additional claims (6, 7, 8, and 9). The company was represented in the whole matter by these attorneys, and their conduct was a clear election to condone Robinson's default and continue the contract in force notwithstanding.

4. Next is the matter of reissue. After the original had been thus hastily issued through Robinson's personal act, he changed his mind and decided that the invention was not rightly protected and that the claims were quite inadequate. Accordingly, he employed another attorney, offered the original for surrender, and filed the reissue application. Here, again, his action was high-handed and an entire breach of his contract duty; but still, again, it must be held that the breach was waived. On his suggestion to the attorneys that the claims of the original were inadequate, they advised Robinson that there should be an immediate reissue, they consulted together about the best form of claims, and there was co-operation until they learned that he had filed the application by another attorney. Their only objection then was:

"We do not know what effect the prosecution of the reissue pro se by you will have upon the contract."

In December, 1913, they complained of this conduct as a breach; but in April, 1914, they are found claiming the license, and this can

refer only to a license under the reissue. In its answer in this case, the company twice alleged Robinson's continuing fault in not giving a license under the reissue. After the answer was filed, the company again indicated a claim that the reissue constituted a breach of the contract; but this was too late. Robinson had then put the controversy into the hands of the court under a bill which committed him to that license under the reissue which the company had been asking.

[3] We have the less hesitation in holding that the company cannot rely upon the taking of the reissue as a breach of the contract, because there is no reason to think that substantial prejudice to the company has resulted therefrom. It is apparent that the only complaint of the original and the only ground for reissue was the absence from the original of sufficiently broad claims; and, in this situation, it would seem that the eleven claims of the original, repeated verbatim in the reissue, are just as valid as they were in the original. · The company, as the holder at the time of substantial interests in the original patent, could not be bound by any narrow construction which Robinson erroneously put upon the original claims to support his theory that a reissue was necessary; and if the broader claims of the reissue shall not be sustained, the company will be entitled to have the same construction put upon the original claims as if the reissue had not been made. It is true that such damages as might have accrued against others from infringement of the original patent before its surrender have been forever lost (Reedy v. Scott, 90 U. S. [23 Wall.] 352, 364, 23 L. Ed. 109); but the existence of such damages, in material amount, is problematical, and their possible existence is a thing which the company must have taken into account while it was treating the reissue as the rightful substitute for the original.

5. Next comes the denial that the company's product is covered by the claims of the patent, leading to a denial of any liability to pay the contract royalties.

We must first observe that the question is not whether the company's device is covered by any valid claim. The subject of the validity of the patent which was to be obtained, the contract takes care of in another way, when it provides that royalties must continue to be paid until the patent is judicially declared invalid. Therefore, when the contract refers to paying royalty upon the company's product which is "covered by the patent to be obtained," it must refer to a situation where, when the claims are assumed to be valid and construed as the circumstances require them to be, they will cover the company's device.

No one questions that some of the added claims of the reissue reach and cover the devices in question; but we prefer to dispose of this matter as if affected only by the claims of the original patent. Upon a review of these claims, we entertain no doubt that the court below was right in thinking that royalties accrued, for, regardless of any expert testimony or of what occurred between the parties, an inspection of the company's device shows that at least claim 9 reads thereon so clearly that the device must be considered to be "covered" by the patent. When we take into account the differences between claim 9 and other claims, there is no room to give it any narrower construction

than its language seems to imply. Both the face of the patent and the contemporaneous conduct of the parties make it clear that this claim (if not also others) cannot be restricted by interpretation. It is either valid as broadly as it reads or invalid because too broad.

[4] Further, it appears without dispute that the original purpose of the company was to get a patent which would cover the product which it was making, then and continuously thereafter, as well as the product of all other manufacturers then operating; that unless the claims did cover its product and at least a part of the others, it had no object in continuing for years its effort to get this patent; that the four claims added after Robinson's order for immediate issue were formulated by him and by the attorneys with this broad purpose, which was then regarded by both of them as sufficiently accomplished. Claim 9 is one of those so added. To permit the company now to say that this patent does not cover its product would be to allow it to repudiate the whole theory upon which it dealt with Robinson for years and which it allowed him, if it did not lead him, to accept as the basis of their continuing relations.

[5] 6. In its answer and in amendments thereto, the company set up a large number of earlier patents and inventions, and sought to take testimony concerning them. The court declined to allow such testimony, and struck out these paragraphs from the answer. In this action, there was no error, so far as concerns the rights of the parties before decree. This was not, in any sense or degree, an infringement suit. If the contract of license counted upon was valid and in force, the licensee could not question the validity of the patent; if the license contract could not be enforced, that was the end of the suit. It is true that a licensee may show the state of the art, as an aid to determining the construction of the patent; that was not the company's effort here. Not only was each stricken paragraph of the answer introduced by the statement that the Robinson patent was anticipated or was made invalid by the older patents and the uses recited; but, as we have already held, there was no room for any construction permitting the conclusion that the patent did not cover the company's product. The company's right to show the patent's invalidity as affecting future royalties will be considered hereafter.

7. Paragraph 23 is said to show that the contract was in violation of the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209), and, therefore, void. This conclusion cannot be supported. The paragraph is ambiguous. It is obvious that a patent, giving such a broad monopoly as was here expected, might rightfully be used as the basis of "trade relations" with other manufacturers, looking toward a complete control of the coaster brake business. Doubtless it could be used unlawfully to the same end; and it appears that the company did proceed to enter into a combination which the government caused to be dissolved because it was in violation of the Anti-Trust Act. There is nothing to show, however either that this unlawful combination was essentially dependent upon the Robinson contract with the company, or that Robinson knew that the company intended to abuse the advantages it derived from the contract rather than to use them lawfully—much less that Robinson participated in any such intent.

Under these circumstances, the company cannot be heard to make this defense.

[6] 8. It results from the views so far expressed that the company must pay royalties to Robinson; but when these payments should begin and how long they should continue must be determined. The language of the contract is very peculiar (see paragraphs 8, 9, 10, quoted above). Robinson was experienced in the soliciting of patents, as were the attorneys representing the company, and they both knew that the shape which the claims of a patent would take could never be determined till the patent issued, since rejections and amendments might come even after the final fee was paid and the printing in progress. It is, therefore, not easy to understand how they could contemplate the accruing of royalties contingent upon the terms of a patent to be obtained, and which royalties should, nevertheless, accrue before the patent issued; yet they make very express provision for commencing the royalty period at the time when there was a final award in the interferences. We see no way to construe all these provisions and to make them intelligent and mutually reconcilable and applicable to the complications caused by the reissue, except to say that nothing was payable or due until the patent reissued, but that, when it did so reissue, so that the terms of its claims were finally known, the royalty period, upon whatever the claims turned out to cover, should date back to the specified final award. This construction will directly modify the decree below only as to the matter of interest.

The date of this final award is in controversy. When the contract was made, Robinson was in interference with Townsend and Copeland. These interferences were decided and priority upon the broader issues awarded to Robinson by the order of the Court of Appeals of the District of Columbia, on May 29, 1911. Immediately, another interference was declared between Robinson's same basic application and another application of Copeland. This interference was not finally settled until January 6, 1913, when the Court of Appeals of the District of Columbia decided that this second controversy was within the issues of the former one and was res judicata. Robinson now claims that the royalty should begin at the date of the final determination of the first interference; the company contends that any liability which may exist cannot reach back of the final decision in the second interference. The company is right in its contention. When we undertake to apply to the situation, as it actually developed, the language of paragraph 9 of the contract, we see there is ambiguity. The reference is to the final award of priority in interference proceedings "in which Robinson is involved with other contestants." This, standing alone, would normally refer to the interference proceedings in which he was involved on July 6, 1908, the day of the contract; and yet, when we observe that it could hardly have been intended that royalties should accrue upon an invention while there was pending an interference which might result in a patent upon the same thing to some one else, it may be that "is involved" should be read as meaning "is involved from time to time as the application progresses."

It is also urged with much force that under the special circumstances here existing, the first interference and the second should be

considered as one. Indeed, the decision of the Court of Appeals leads almost to this conclusion. However these things may be, there is clearer ground for the conclusion we have stated. One of the claims, No. 11, of the Robinson patent, as first issued, and a claim which it must be presumed was an essential part of the monopoly which the parties were contracting about, was first made by Copeland in his application that went into the second interference and never was present in Robinson's application until he annexed it by right of conquest after the second interference was finished. In addition to this, claim 9, which is, from most points of view if not from all, the broadest claim of the patent and which forms Robinson's chief reliance in the present suit as a basis of his claim for royalty, never was present in his application until after this second interference was finished. This claim was one of the four inserted by the attorneys during the two weeks' delay allowed after Robinson's personal orders that the patent issue at once. Certainly only the clearest and most unambiguous language could justify the accruing of royalty before the second or rehearing interference was finished and the patent for the first time took substantially its final shape; and, instead of this being clear and unambiguous, the natural inferences are all the other way. If there were doubt about this, it would be solved by Robinson's letter of May 14, 1913, in which he says:

"Now it is pointed out that the 'final award of priority in favor of Robinson in interference proceedings in the matter of the application of October 8, 1897,' was the issue of the decision of the Court of Appeals in Interference No. 33,840, dated and decided January 6, 1913, awarding priority to Robinson. That finished the interference, and any delay since that time has been in the hands of counsel. It seems clear, therefore, that the accumulation of royalty must be computed from that date."

9. We have found that Robinson was in fault for not executing or tendering the formal exclusive license. He should have done so, when the original patent issued, and when his only claimed reason to the contrary disappeared. If it be thought that the almost immediate application for reissue postponed this duty, then he should have done so upon the reissue. At the latest, he should have distinctly made such tender upon filing this bill, instead of relying on the mistaken theory that the formal license was unnecessary. At the same time, we have found action by the company, continuing up until after the filing of the bill, such that it cannot be permitted to rely upon the lack of this formal license to destroy its contract obligations to Robinson. The question is whether, by permitting the exclusive license to be given now, we can restore substantially the situation which would have existed if it had been given when the patent issued or tendered when the bill was filed, and can put the company in substantially the same shape as if it had then, as was its duty to do, accepted the license and proceeded with the contract. It may be that changes in the manufacturing or trade conditions during the interval, impair such restoration, but the burden was upon the company to make proof to this effect, and it has not done so.

The record indicates only one difficulty. Paragraph 9 of the contract provides for the company the only escape from the continued payment of royalties (unless by paragraph 22). If the formal license had been

delivered when the patent issued, and the company had proceeded under the contract, and if it had been of the opinion, as it now is, that the patent was invalid, it would at once have begun or caused to be begun some suit which would lead to a judicial determination and so either establish the patent or end the royalties. We make allowance for the reissue delay and give the company the benefit of whatever doubts there ought to be, if we assume that, acting with diligence, it could have secured such judicial determination within two years from the original issue, or by July 8, 1915. It is somewhat arbitrary, but essentially fair to assume that if the royalties ought to terminate under paragraph 9, the necessary judgment would have been pronounced as early as that date, that it would not have occurred earlier, that, until that time, the liability of the company for the contract royalty was inevitable, but that the delay from that time to this in instituting proceedings which may lead to that result has been so far the result of Robinson's default and of the confusion and uncertainty thereby created that he must allow further reasonable opportunity for that test, before exacting a further performance of the contract.

After the suit was commenced, the company seems to have executed a transfer to Robinson of everything that had been assigned to it. This was never completed by delivery and acceptance, but the record indicates that it may have been recorded in the Patent Office; if so, Robinson should at once execute and record a sufficient release and quitclaim back to the company of everything so apparently transferred. At the same time and within 30 days after the mandate goes down, he should execute and deliver to the company, or deposit with the clerk of the court below for delivery to the company, an exclusive license, under the reissue patent, but otherwise in the form prepared and tendered to him on July 8, 1908. Thereupon, the company must pay to him the prescribed minimum royalties for ten quarters commencing with the quarterly payment due April 6, 1913, and ending with that due July 6, 1915, and with interest at 6 per cent. from the date of the reissue, on payments due theretofore, and with interest at the same rate from the date of each maturity on payments due thereafter. There should also be an accounting, if desired, to ascertain whether more than the minimum accrued during these ten quarters, and, if so, the excess amount should be paid as soon as it is fixed. If Robinson should fail to execute and record the reassignment (if by record of assignment to him this has become necessary) or to execute and deliver the license, his bill will be dismissed. If the company should fail for 30 days after the delivery of the license to pay the minimum royalty for the ten quarters and interest, it will lose its right to any further consideration, and it must pay at once, also, the remainder of the $20,000 agreed minimum, with interest, and be subject to the general accounting as provided in the decree appealed from. If the company does make this payment for the ten quarters, thereupon all further proceedings (except the accounting as to the excess in these ten quarters) should be stayed for 60 days. Within this period, the company may institute such proceedings as it may be advised, for the purpose of obtaining the judicial decision contemplated by paragraph 9. If it elects to bring an infringement suit against another manufacturer, Robinson must join therein as

provided by paragraph 18. So long as the selected proceeding is prosecuted with the utmost diligence, the stay may continue. If, upon the final determination of such proceeding the patent is found invalid within the meaning of paragraph 9, the company will be excused from all payments, except the royalty (both minimum and excess) for the first ten quarters. Lacking such result, the stay will expire and the accounting will proceed in the court below for all the intervening period. All time limits herein mentioned are subject to modification, in the discretion of the court below.

[7] We see no reason why the company, if it so elects, may not proceed in this cause to obtain the decree which shall establish the validity of the patent or the contrary. The general rule that a licensee may not dispute the validity of the patent must yield, as far as necessary, to an express provision providing for a decree of invalidity as the means of ending the contract. Probably the rendering of such a judgment in a suit prosecuted by Robinson and the company against a third party infringing was the thing specifically in the mind of both parties; but if the licensee, under a contract like this, is later convinced that the patent is invalid, suit in a proper court brought by the licensee against the licensor is the most direct and sure way to get the question decided, without the suspicions of collusion sure to arise if the licensee were prosecuting a suit which it brought against a stranger and in which it wished to fail. If this may be done by direct suit, it surely may be done by answer, under the provisions of general equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), in a suit in the United States District Court.

The company, in its answer and amendments thereto in this case, laid all foundation for obtaining such a judgment, except that it did not pray therefor. It set up the invalidity of the patent, not as a basis for obtaining a decree terminating the contract, which it might have done, but as a basis for defending against current liability under the contract, which it could not do. The election which we now permit to institute proceedings looking to such a judgment may be exercised (if defendant desires) by reforming its answer in this cause.

The proper interpretation of "null and void" in paragraph 8, we cannot now consider. Whether this phrase means utterly void as to all claims, or whether it means void as to those claims which might purport to secure the monopoly contemplated by the parties, is a question to be later decided by the tribunal to which it is presented.

The decree below must be reversed, and the case remanded for proceedings in accordance with this opinion. The appellant will recover costs in this court. Costs in the court below will be in the discretion of that court.

## On Motion for Rehearing.

PER CURIAM. On application for rehearing, the Miami Company, for the first time, brings to our attention the claim that Robinson accepted the retransfer to him of everything which the company had received from him, and to which attempted retransfer the opinion refers. This suit was commenced on July 13, 1914. On November 2, 1914, by an amendment to the answer, the defendant alleged that it had renounced the contract by notification to Robinson in a letter dated

and mailed on September 29, 1914, and that the defendant had retransferred to Robinson all the patents and applications which were the subject-matter of the contract. To this Robinson replied denying that the defendant had any right to renounce the contract as claimed in the amendment. We think we rightly interpreted this record as failing to show that any retransfer to Robinson had been effectively made. We are now told that, in the court below, it was agreed between counsel that the retransfer had been completed on September 29, 1914, that Robinson's brief in the court below was upon that theory, and that the decree framed by Robinson's counsel in the court below is upon the same theory, and, for that reason, awarded only that royalty which had accrued up to September 29.

Counsel for Robinson, responding to the application for rehearing, do not concede that the transfer was made and accepted; yet we are not sure that they deny it. It may be that when the reply denied the right of the company to "renounce" the contract it contemplated only the liability already accrued. If in fact the retransfer was accepted by Robinson, either expressly or as a necessary effect of what was said and done in the court below, and if the intent and effect of the retransfer were to deprive the company of its status as licensee under the main patent, it is obvious that there could be no recovery in this suit, except for the royalties which had then accrued; but the existence and all the effect of such retransfer and acceptance cannot be decided by us upon this record. These questions must be remitted to the court below for its decision, except as hereafter stated.

It is not now apparent to us how this retransfer can affect the right to recover the royalties then already accrued; but if there are reasons which lead to such a result, the court below will be at liberty to consider them and give them due effect. We have held that the company has the right to initiate proceedings looking toward a judicial determination that the patent was invalid; but for the reasons stated in the opinion it must be assumed that its obligation to pay royalties and be considered a licensee continued at least till September 29, 1914; and it cannot be heard to question the validity of the patent as against royalties arising before that date. If, therefore, it shall be found that the company then ceased to have the rights and carry the burdens of a licensee, there will be no occasion to litigate the validity of the patent. In the event that it is so found, the decree below will require no modifications, except those resulting from the conclusion that the accruing of royalty will begin January 6, 1913, and the recovery thereof will be upon condition that Robinson execute and deliver (instead of the exclusive license specified by the opinion) an assignment of the legal title to and the right to recover all profits and damages that accrued from any infringement of the reissued patent by others prior to September 29, 1914, and which assignment shall provide that one-half of the net sums collected thereunder shall be paid by the company to Robinson. The other conditions specified in the opinion to attach to the execution of the decree will be inappropriate.

The application for rehearing is denied; and, except as herein provided, the conclusions of the opinion remain unmodified.