### HORVATH v. McCORD RADIATOR & MFG. CO.

District Court, E. D. Michigan, S. D. June 25, 1928.

No. 1877½.

1. Contracts ⊗═32—Verbal agreement, to be reduced to writing simply as memorial, is binding, though never put in writing.

If parties to verbal agreement understand that it is to be reduced to writing and signed simply as a memorial of agreement, rather than as consummation of negotiation, agreement is binding, though never put in writing.

2. Patents ⊗═209(1)—Execution of formal contract, referred to in parties' correspondence, held not condition precedent to right to patent license.

Execution of formal written contract, referred to in correspondence between parties to patent infringement suit, held not intended as condition precedent to defendant's right to license provided for by such correspondence, which constituted a sufficient legal contract, but merely as convenient memorial of terms

thereof, and hence not necessary to bind plaintiff.

3. Patents ⊗═209(1)—No particular form of language or execution is necessary to grant patent license.

No particular form of language or execution is necessary to make contract effective as grant of license rights under patent, if parties capable of contracting have expressed their mutual assent to terms on which such license is to be granted.

4. Patents ⊗═209(1)—Right under informal contract for patent license to require execution of formal recordable license cannot affect sufficiency or validity of contract.

Existence of right, under informal contract for patent license, to require execution of formal recordable license, cannot affect sufficiency or validity of contract, nor be urged as basis for any right of patentee to take advantage of his own default, though it cannot be treated as immaterial condition, which he may disregard, in absence of waiver by licensee.

5. Patents ⊗═218(5)—Licensee's sales of spiral radiator tubing separately and in assembled units and delivery of spiral tubing made from customers' plain tubing, must be treated as sales of spiral tubing in determining patentee's royalty on "gross sales."

Separate sales of patented spiral radiator tubing for use by purchasers in manufacture or assembly of other articles, sales of finished assembled units including such tubing, and conversion of plain tubing, delivered by manufacturer's customers, into spiral tubing then delivered to such customers, must all be treated as sales of spiral tubing, in determining meaning of term "gross sales," on which patentee's royalty under license contract was to be computed; such distinctions in forms of selling operations involving no difference in substance or legal effect.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Gross Sales.]

6. Patents ⊗═218(5)—Patentee's royalty held not to be computed on licensee's "gross sales" of assembled units, but on price of patented radiator tubing itself.

Royalty on "gross sales," payable to patentee of spiral radiator tubing under license contract, held not to be computed on gross sales price of assembled units, including such tubing, but on price of tubing itself, as ascertained by applying to prices of such units and tubing the same ratios properly applicable to the respective costs thereof.

7. Patents ⊗═218(5)—Parties to license contract held to have construed "gross sales," on which patentee's royalty was based, as gross sales of patented radiator tubing, not assembled units.

Where patentee, of spiral radiator tubing, as well as licensee, was fully cognizant of business practices of licensee and others in same industry regarding various forms of dealing with such tubing, and contemplated that agreed royalty should be computed on gross sales of tubing itself, whether sold separately or as part of larger units, and whether produced from

plain tubing furnished by licensee's customers or raw material furnished by licensee itself, parties placed on term "gross sales" a practical construction, precluding holding that royalty should be computed on gross sales price of assembled units.

In Equity. Suit by Geza Horvath against the McCord Radiator & Manufacturing Company, which filed a counterclaim. Bill dismissed, and relief sought by counterclaim granted.

MacKay, Wiley, Streeter, Smith & Tucker, of Detroit, Mich., for plaintiff.

Warren, Hill & Hamblen, of Detroit, Mich., for defendant.

SIMONS, District Judge. The bill of complaint herein was filed by Geza Horvath, a citizen of Michigan, plaintiff, against McCord Radiator & Manufacturing Corporation, a Maine corporation, defendant, seeking an injunction and an accounting against the defendant by reason of the alleged infringement of a certain patent owned by the plaintiff, which he claims is being infringed by the defendant. The defendant filed an answer denying infringement, and a counterclaim seeking specific performance of a contract whereby it claims that the plaintiff agreed to execute and deliver to it a formal license under his said patent. The cause has been heard on the pleadings and on the proofs thereon taken in open court.

The two crucial ultimate questions involved are: (1) Is the right of the defendant to the license which it claims dependent upon the execution by the plaintiff of a formal written license, in addition to the agreement already entered into between the parties by correspondence? (2) What is the meaning of the term "gross sales," as used in said correspondence between the plaintiff and the defendant?

The material facts, as disclosed by the record and as hereby found by the court, are, in so far as they need be stated for the purposes of this opinion, as follows:

In 1923, the plaintiff was granted United States letters patent No. 1,472,719 for a machine for making spiral tubing, which he had invented and which was used in the manufacture of spiral tubes for radiators and other commercial products. Several years prior thereto, plaintiff had been in, but had left, the employ of the defendant, and had become generally familiar with the nature and extent of the business operations of the latter in connection with the manufacture of plain tubing and the utilization and assembly thereof in radiators and other manufactured products. During the latter part of the year 1924, plaintiff had several conferences with officers of the defendant, particularly with A. C. McCord, its president, relative to the re-entry of the plaintiff into the employment of the defendant. These conferences resulted in an arrangement whereby the plaintiff was employed by the defendant, on a month to month basis, for experimental, engineering, technical work at a salary of $1,000 per month, with the understanding that the defendant would be entitled to a license under the spiral tubing patent, No. 1,472,719, already mentioned, on the payment of a royalty of 3 per cent. on gross sales of such tubing, and that any further patentable inventions adapted to the business of the defendant, which might be developed by the plaintiff while in such employ, should belong to the defendant without compensation or royalties. On December 30, 1924, at the conclusion of these conferences and before plaintiff had actually entered said employ, the defendant, through the said A. C. McCord, its president, wrote and delivered to the plaintiff a letter outlining the terms and conditions of the arrangement covering its proposed employment of the plaintiff and its proposed acquisition of rights in the plaintiff's patents, as discussed in said conferences. This letter was divided into separate paragraphs.

Paragraph No. 2 on page 1 of said letter began with the statement, "In the first place, you are to come with us upon a salary of $1,000 per month," and continued with a brief recital of the duties and rights of the parties with respect to future inventions of the plaintiff. Paragraph No. 2 on page 2 was as follows:

"You are now the sole owner of two patents in which we are interested: Patent No. 1,472,719, covering spiral tubes. It is my understanding that, should we wish to take up the manufacture of this tube, we may acquire the exclusive right to make and sell this (excepting the right already issued to the National Can Company) by the payment to you of a royalty of 3 per cent. on the gross sales."

Paragraph 5 on page 2 was as follows:

"My understanding is that, upon any of these arrangements we would enter into with you in regard to payment of royalties, our rights should be for the life of the patent and would cover any modifications or improvements upon such inventions; in other words, I would not want to contemplate our launching into some new line of manufacture, where we were limited to the specific thing

covered by the patent, but we would want any improvements you might make upon the device, or a substitute for it, to be included under the same arrangement."

Paragraph 6 on page 2 was as follows:

"Likewise, you should have some rights, in case, for any reason, the manufacture was discontinued and you were not receiving a reasonable amount of royalty, to cancel the particular royalty arrangement. It is not the intention of this company to acquire rights under these patents not related to our regular business and shelve them. It is difficult to work out a definite basis in advance, but the plan contemplated is that if, from a fair business standpoint, your patents are not being used and you are suffering a hardship by being prevented from making an arrangement with others, you would have the right of cancellation. In this case, however, I think the burden of proof should be altogether upon you, particularly if the company had gone ahead in good faith and spent money upon an effort to develop the invention."

The other paragraphs of the letter did not refer to this patent and need not be quoted nor recited here.

On January 2, 1925, plaintiff wrote and delivered to the defendant a letter, replying to the letter to which reference has just been made. This letter of the plaintiff began with the following paragraph:

"This morning I presented to Mr. Hammer my written acceptance, dated December 31, 1924, of your proposition of employment by the McCord Radiator & Manufacturing Company, dated December 30, 1924. In our conversation Mr. Hammer expressed the opinion that my acceptance should cover more fully the details to which I referred in my letter of December 31st, and I suggested to Mr. Hammer that I would answer your letter of December 30, 1924, paragraph by paragraph, and taking your letter in this manner I am answering same as follows."

The Mr. Hammer mentioned was vice president of the defendant. The letter then refers to and specifically answers each of the paragraphs of the aforesaid letter of the defendant. The paragraphs of plaintiff's letter thus dealing with the corresponding paragraphs (hereinbefore quoted) of defendant's letter were in the following language:

"Paragraph 2—Page 1.—I accept employment with the McCord Radiator & Manufacturing Company, which arrangement will also cover any work of like nature that you may desire me to do for the McCord Manufacturing Company, Inc., at a salary of one thousand ($1,000) dollars per month, upon the conditions and terms as outlined in said paragraph 2, page 1, of your letter. * * *

"Paragraph 2—Page 2.—In re patent No. 1,472,719. I accept this paragraph as stated in your letter, but before any operations are started under such patent a formal legal contract shall be prepared and executed between the McCord Radiator & Manufacturing Company and myself, which will give to the McCord Radiator & Manufacturing Company the exclusive rights in such patent No. 1,472,719 in the United States and Canada, but not in any other countries, excepting, however, such rights as may now belong to the National Can Company under United States letters patent No. 1,472,719. * * *

"Paragraph 5—Page 2.—This paragraph is satisfactory to me as it is stated in your letter. * * *

"Paragraph 6—Page 2.—This paragraph is satisfactory to me as it is stated in your letter."

This letter concluded as follows:

"In conclusion, permit me to say that it is my desire and preference that any license royalties due me under the various present patents, and patents that may be obtained by me, as outlined above, shall be paid to me quarterly for each quarterly period of each calendar year, so long as our relations may continue as outlined in your letter of December 30th, and this letter to you.

"Please be assured, Mr. McCord, that I am sincerely desirous that the relationship upon which we have now entered shall prove satisfactory and profitable to all parties concerned."

Pursuant to this exchange of correspondence, the plaintiff entered upon his duties for the defendant the 1st of January, 1925, and continued in this employment until May 1, 1926, during which time he was paid the compensation agreed upon in such correspondence. About June 1, 1925, defendant began the manufacture and sale of spiral tubing embodying the invention of the plaintiff's patent No. 1,472,719. At about this time, the defendant purchased the assets and business of the National Radiator & Manufacturing Company, a corporation to which the plaintiff had previously given certain shop rights under his said patent. The agreed royalty for those shop rights was based, as in the present case, upon a percentage of the licensee's "gross sales," and plaintiff subsequently brought suit against such licensee for the recovery of royalties claimed by him to be due on the basis of such "gross sales." The defendant, however, claims no rights under said patent by reason of its purchase from

this other company, just named, but has based its right to manufacture and sale under this patent upon the arrangement expressed in the correspondence already quoted, which it has from the first claimed to constitute an enforceable contract, entitling it to the rights of a licensee under such patent.

This claim the plaintiff disputes, contending, first, that these letters show an intention by the parties to make the granting of any such license conditioned upon the execution of a further formal license contract, which was never executed; and, secondly, that the term "gross sales," as applied to the particular manufacturing operations of the defendant under this patent, is so indefinite and uncertain that the contract which defendant claims is void for uncertainty. Those contentions present, as already indicated, the two meritorious questions here involved, and will be considered in the order named.

[1] 1. The controlling rule applicable to the first of the questions just stated was considered and discussed by the Circuit Court of Appeals for this Circuit in its recent opinion in Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corp., 20 F.(2d) 67, in which (on page 70) the court said:

"Whether a contract results from an exchange of definite communications, when a formal contract is intended later to be prepared and executed, is a question which has received much consideration. Whether one so results is mainly a question of intention. The law is well stated in Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 41 Am. St. Rep. 545, 553, as follows:

" 'If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.' "

As was pointed out by the same court in Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 147 F. 641, at page 655:

"It is well settled that, though the parties to a verbal agreement contemplate that it is to be reduced to writing and signed, yet if the understanding is that this is to be done simply as a memorial of the agreement it is binding, notwithstanding it is never put to writing."

[2] This court has carefully considered the entire record, and is satisfied therefrom, and finds as a matter of fact, that the intention of these parties, as expressed by them, was that the execution of the "formal" contract referred to in the correspondence, which correspondence constituted a sufficient legal contract between them, was not to be a condition precedent to the right of the defendant to the license for which such contract provided, but was to be merely a convenient memorial of the terms of such contract, which the plaintiff was bound to execute on demand by the defendant, but for which defendant was not bound to wait before it was entitled to exercise its rights as a licensee, definitely and positively granted to it by its contract with the plaintiff evidenced by the correspondence already quoted.

[3] That such correspondence constituted a contract between the parties seems sufficiently clear. It provided for the employment of the plaintiff by the defendant, and definitely and fully prescribed the duties, period, and compensation thereof, and its terms and conditions in those respects were observed and performed by both of the parties without any objection or question. There seems to be no good reason for any distinction between the employment features of this contract and the license features thereof, as regards certainty or validity. There is here no statutory defect nor deficiency in any respect, and none, indeed, is claimed. No particular form of language nor of execution is necessary to a contract, in order to make it effective as a grant of license rights under a patent, under the circumstances here disclosed, provided that, as this court is convinced is true in the present case, parties capable of contracting have expressed their mutual assent to the terms on which such a license is to be granted. Bijur Motor Lighting Co. v. Eclipse Machine Corp., 243 F. 600 (C. C. A. 2); Miami Cycle & Manufacturing Co. v. Robinson, 245 F. 556 (C. C. A. 6); Keystone Type Foundry v. Fastpress Co., 272 F. 242 (C. C. A. 2). Even an oral contract for such license is valid and enforceable, at least as between the parties thereto, and may be specifically en-

forced in equity. Cook v. Sterling Electric Co., 150 F. 766 (C. C. A. 7).

It is apparent, from the language of these parties already quoted, that their minds met upon all of the terms and conditions of a license contract on which an agreement was necessary to the creation and enjoyment of such a license. The patent was definitely described; the rights granted under such patent were set forth; the duration of the life of such license was fixed; the grounds of cancellation thereof were prescribed; and the rate and times of payment of royalty for such license were specified. The contention of plaintiff based upon the asserted uncertainty of the term "gross sales" will be hereinafter more fully discussed, but it cannot, for reasons to be pointed out, be sustained. I know of no other covenants or conditions which it was necessary that the parties should agree to and express, in order that the defendant should be entitled to the particular rights for which provision was thus made.

[4] It is true that the execution by the plaintiff of a formal, recordable license, in accordance with the terms of the more or less informal contract therefor, may not be treated by the plaintiff as an immaterial condition which, in the absence of waiver by the defendant, he may rightfully disregard, and the performance of that condition may be insisted upon by the defendant and specifically enforced at the instance of the defendant. Miami Cycle & Manufacturing Co. v. Robinson, supra. The existence, however, of this right on the part of the defendant (which, clearly, it may waive if it choose), cannot affect the sufficiency nor validity of the contract under consideration, and in any event, under familiar equitable principles, cannot be urged by plaintiff as a basis for any right on his part to take advantage of his own default in that connection. This court is clearly of the opinion that the contentions of the plaintiff in this connection must be overruled and the claims of the defendant sustained.

[5] 2. The sales by defendant of the spiral tubing which it manufactured under the patent here involved, and on the gross sales of which the stipulated royalty was to be computed, included three methods of sale, all of which were, at and prior to the time of the making of this contract, well known to the plaintiff, and, as the record leaves no room to doubt, must have been contemplated by him, at the time when he entered into this contract, to be various forms of what were, in essence and substance, sales of such tubing within the fair, natural, and ordinary meaning of the term "gross sales" as used in such contract. These slightly varied forms of selling operations were: (1) The sale of spiral tubing separately for use by the purchaser in the manufacture or assembly of other articles or as he might desire; (2) the sale of finished, assembled units, such as radiators and other articles or machines, which included, as component parts thereof, this tubing and also other constituent parts; and (3) the treatment of plain tubing, delivered to it by certain of its customers, by means of machines embodying the invention of this patent, so as to convert such plain tubing into spiral tubing (with substantially the same effect as if it had manufactured such spiral tubing from plain tubes supplied by it, instead of by said customers), and the delivery of such tubing, in its changed, spiral form and character, to the customers which had supplied the raw material for the production of such spiral tubing.

It is now claimed by the plaintiff that the difference between these varied forms of operations of the defendant in connection with this patent are such that the meaning of the term "gross sales," as a basis of compensation, is too indefinite and doubtful for the requisite legal certainty. I have given careful consideration and study to the arguments of the plaintiff in this connection, but am unable to agree with his contention in this respect. It seems to me that, regardless of the nominal distinctions between these slightly varied forms of selling operations, they are distinctions in procedure only, and involve no difference in substance or legal effect. Fairly considered, and viewed in the light of their essential character and result, they should, in my opinion, be regarded and treated as sales of the spiral tubing involved. Certainly each sale of the assembled units mentioned necessarily involves a sale of the tubing contained therein, and, as to the class of operations last considered, it can make no difference, so far as substance is concerned, whether the material from which the spiral tubing was produced was furnished by the defendant directly or by its customers indirectly, and it appears that this converted tubing is billed to such customers as a product of the defendant.

[6] Nor can I accept the contention of plaintiff to the effect that, if the sales of these assembled units should be held to constitute sales of the spiral tubing embodied therein, the specified percentage of royalty thereon should be computed on the gross sales price of such assembled units, rather than on the price of such tubing itself. It is clear

from the record that the gross sales price of the separate pieces of spiral tubing forming component parts of these larger assembled units may be accurately and readily ascertained, from the accounting methods of the defendant and according to the fact, by applying to the prices of such units and tubing, respectively, the same ratios as are properly applicable to the costs thereof, respectively. If, as plaintiff claims, the sales of these assembled units by the defendant were acts in infringement of this patent, the accountability of the defendant to the plaintiff by reason thereof would, under settled rules of patent law, be limited to the pro rata amounts fairly and reasonable apportionable to the infringing tubing itself, as distinguished from the proceeds of the larger units containing such tubing. To construe the term "gross sales," here obviously intended by the parties to apply to the tubing itself, to an entirely different, greater, and more expensive article, would be, in my opinion, to unfairly and improperly distort the plain meaning of this language and to give it a strained, far-fetched, and unjustifiable construction.

[7] Furthermore, the record renders unavoidable the conclusion that the plaintiff, as well as the defendant, was, at and before the making of the contract in question, fully cognizant of the business practices of the defendant and of other companies engaged in the same industry in regard to these various forms of dealing with tubing, and it cannot be doubted that the plaintiff, as well as the defendant, understood, consented, and contemplated that, in the absence of some special arrangement on the subject, or of some objection or question on his part, the agreed percentage of royalty should be computed on the gross sales of this tubing itself, whether sold separately or as a part of a larger unit, and whether produced from plain tubing furnished by customers of the defendant or from raw material furnished by the defendant at its own expense. When questioned by the court on this subject, the plaintiff was positive in his assertion that there was no discussion as to whether there was any indefiniteness in the term "gross sales." It appears, also, that the plaintiff has claimed, and brought suit to recover, royalties from at least one other company on the basis of the alleged agreed percentage on "gross sales." If, therefore, as I do not think is the case, the meaning of this term was otherwise ambiguous or doubtful, I am fully satisfied that both parties here have, by their acts and conduct, placed a practical construction upon that term inconsistent with the present contentions of the plaintiff in this connection, which contentions cannot be sustained.

For the reasons stated, the bill of complaint must be dismissed, and the relief sought by the counterclaim granted in favor of the defendant and against the plaintiff, with costs to be taxed.