BENNIE P. HANSON et al., Appellees, v. HALL MANUFACTURING COMPANY, Appellant.

CONTRACTS: Nullifying Contract or Attaining Absurd Results. A
1, 5    construction which would deprive a contract of all meaning must necessarily be rejected if any other reasonable construction is possible; likewise, a construction which would involve the contract in contradiction and absurdity. So held as to a contract for royalties on a patented article, and as to the computation of such royalties.

EVIDENCE: Identifying Subject-Matter. Parol evidence is admis-
2    sible to identify the ambiguously expressed subject-matter of a written contract.

CONTRACTS: Mutual Construction. The construction which the
3, 6    parties to a contract have mutually and harmoniously placed thereon. is always influential with the court.

PATENTS: Denying Validity under Royalty Contract. One who
4    has agreed, on proper consideration, to pay royalties for the privilege of manufacturing and selling a patented article may not impeach the validity of the patent.

*Appeal from Wright District Court.*—H. E. FRY, Judge.

NOVEMBER 22, 1918.

ACTION to recover royalties, pursuant to a written contract. There was a verdict for the plaintiff, and judgment thereon. The defendant appeals.—*Affirmed.*

*Herrick & Reed* and *Nagle & Nagle,* for appellant.

*Sylvester Flynn, Perry A. Bronson,* and *Thomas S. Donnelly,* for appellees.

EVANS, J.—I.   The contract sued on was entered into on August 7, 1913, and was as follows:

"This contract made and entered into this 7th day of August, A. D. 1913, by and between Bennie P. Hanson and L. Grenard of Eagle Grove, Iowa, first parties, and the Hall Manufacturing Company of Monticello, Iowa, second party, witnesseth:

1. CONTRACTS: nullifying contract or attaining absurd results.

"1.   That, whereas, the said Bennie P. Hanson invented and obtained Patents No.........on his all steel tongues; and whereas, the said L. Grenard now owns an interest in said patents, and in the stock now on hand belonging to first parties, and whereas, first parties do not possess the necessary money to push the manufacture and sale of said patented tongue as vigorously as it should be handled, this contract is made for the purpose of selling to second party all stock now owned by first parties, and of giving and assigning to the Hall Manufacturing Company the exclusive right to manfacture and sell said patented all steel tongue, during the life of each of the above mentioned patents and during the life of any patent or patents hereafter obtained by either or both of first parties on said invention, or upon any improvement made thereon.

"2.   That in consideration of the payment by second party to first parties at Eagle Grove, Iowa, of the royalty hereinafter mentioned, and the performance of the second party's part of this contract, the first parties hereby assign and convey to the Hall Manufacturing Company of Monticello, Iowa, the exclusive right to manufacture, sell, manage, and otherwise conduct the making and selling of said tongue under said patents now owned or hereafter obtained by said first parties or either of them on the said patented all steel tongues for the respective terms of each and all of said patents.   This right of manufacture and sale shall ex-

tend to and embrace all parts of the United States of America and Canada.

"3.   That, the Hall Manufacturing Company hereby promises and agrees to pay first parties for the rights above mentioned a royalty as follows:   10 per cent on all gross annual sales until the aggregate amount of sales of said tongues reaches $5,000; 7½ per cent on all such annual gross sales in excess of five thousand dollars, and until the aggregate amount of such annual sales of said tongue reaches $10,000; and 5 per cent on the gross sales of said tongues when the aggregate amount of such annual sales exceeds ten thousand dollars.   That the first royalty shall be paid quarterly each year from the date of this contract, and that from and after that time, during life of contract, the royalty shall be paid quarterly.   That second party agrees to furnish first parties with a written report of all sales made each month during the period covered by each installment of royalty that may be paid under this contract.

"4. That the Hall Manufacturing Company hereby undertakes and promises to manufacture said tongue in sufficient quantities to supply all reasonable demands therefor, and to vigorously push the advertising and sale thereof throughout the term of this contract, and to exert every reasonable effort to make this enterprise a profitable business for both parties to this agreement.   Should the manufacture and sale of said invention become unprofitable, or should either party violate his part of this contract, the other may, at his option, terminate this agreement by giving to the other 60 days' written notice.

"5.   The Hall Manufacturing Company further agrees to purchase of first parties all salable and standard stock now owned by first parties, and capable of being used in the manufacture of said all steel tongues.   It further agrees to employ the said Bennie P. Hanson and L. Grenard, as

road salesmen, for said patented all steel tongue, and to pay each the salary hereafter agreed upon.

"6. It is further agreed that the said Hanson will work in the shop or factory until the business of manufacturing said tongues is well started, and that he will at all times, by his advice and assistance, help in making this enterprise a success.

"It is further agreed that neither party shall, during the term of this contract, be directly or indirectly interested in any other company or concern, or with any other person, engaged in the manufacture of tongues of any kind."

At the time of the making of the contract, the defendant was a manufacturing concern, located at Monticello. The plaintiff Hanson was an inventor and a mechanic, who had devoted much time to the development of an "all-steel tongue" for horse-drawn vehicles. He was engaged in manufacturing these devices in a small way at Eagle Grove. He had obtained one patent some years before. Since that time, he had changed his device to some extent, and, as he believed, had improved the same; and he was pursuing the effort of obtaining other patents, to cover his later improvements. His devices, so far as they are involved here, consisted of an "all-steel" wagon tongue, made of hollow tubing, tapered down from the rear forward, with a slot extending the full length of the same, and so contrived as to be readily capable of adjustment to any make of vehicle. The purpose of the slot was to give greater elasticity to the tongue, and to prevent crystallization, and also to prevent rusting from dampness on the inside. His other device was an all-steel buggy tongue, made on the same plan as the first except that its method of connection with the vehicle was different. The plaintiff Grenard was an assignee of a one-half interest in the plaintiff's devices, who co-operated with him in their development, and who was to be a joint owner

with Hanson of patents to be obtained. Such was the situation of the parties antedating the contract, when the defendant's attention was attracted to the device, and it sought and obtained an interview with Hanson, which resulted in the contract.

Pursuant to the contract, the plaintiffs ceased their work at Eagle Grove, shipped their stock to the defendant, and entered at once upon the employment with the defendant, as stipulated in the contract. Grenard became a salesman on the road, and Hanson took charge of the manufacture of the steel tongues at the factory. Efforts to obtain additional patents were continued. Patents were, in fact, obtained in the following year. In the course of their efforts, the plaintiffs discovered that one Bolte had obtained patents, many years before, upon what was called a "draft attachment" for vehicles, and it was deemed advantageous to acquire the same. They did acquire the same, by purchasing them at their own expense, and took an assignment thereof in the name of J. S. Hall, the president of the defendant company, it being intended thereby to give the defendant the full benefit of said patents. These were acquired on December 30, 1913. For the purpose of including the same within the operation of the contract above set forth, J. S. Hall inserted, in the blank space following the word "No," in Paragraph 1 of the contract, the following parenthetical memorandum: "727886 and 818997 purchased of C. J. Bolte 12–30–13. J. S. Hall." The last name was evidently intended as a signature to the memorandum. The dispute in this case rests wholly upon a construction of the written contract. Its ambiguity has arisen almost wholly out of the insertion therein of such memorandum. The parties operated under the contract for about 15 months. On September 15, 1914, the defendant served notice of termination of the contract. In the meantime, the business had developed to very creditable proportions, the defendant's

sales of tongues amounting to more than $34,000, all of which was new business. The defendant terminated the contract, not because it was about to cease the manufacture, but because it conceived that the device was unpatentable, and that the payment of royalty was unnecessary. It does not deny its liability for a royalty, under the terms of the contract, up to the time of its termination, November 15, 1914. It contends, however, that it is not liable, under the terms of the contract, for the payment of any royalty for the manufacture of the steel *buggy* tongues. The ground of this contention is that the all-steel *buggy* tongue was not, in any sense, an improvement over the device shown in the *Bolte patents*. The argument that is made in its behalf here is predicated entirely upon the assumption that the contract is confined in its operation to the *Bolte patents,* and to improvements thereto. The Bolte patents did not involve an "all-steel tongue," at all. It simply involved an adjustable attachment of either tongue or shaft to a vehicle. If the contract is to be construed as applying exclusively to the *Bolte patents* and improvements thereto, then it had no meaning whatever when it was first entered into, and when its performance was first undertaken. Without dispute, the Bolte patents were not within the contemplation of the parties when the contract was entered into. Their existence was unknown to the parties. The contract, as entered into, was full and complete. It was not essential to its validity that the blank space in Paragraph 1 should be filled at all. Parol evidence was admissible

2. EVIDENCE: identifying subject-matter.

to identify the subject-matter of the contract. This shows, without dispute, that the only *existing* patent referred to was the one then held by Hanson, and that the future patents provided for were those which were later issued to Hanson and Grenard. Construing the contract, then, as it was made, and as its performance was begun, it had no reference whatever to the Bolte

patents. It appears from the undisputed evidence, also, that the memorandum above set forth was inserted for the pur- pose of giving to the defendant the benefit of the Bolte patents in the performance of the original contract. Whether such insertion was effective for that purpose, and whether oral testimony was admissible to show the purpose and effect of such insertion, we need not inquire, because the defendant admits its liability for royalty under the Bolte patents. In construing the contract, therefore, we must treat the insertion as a mere addition to the contract, and not as a retraction of any part thereof. The defendant concedes its liability for the all-steel *wagon* tongues. If it was liable for the all-steel *buggy* tongues, prior to December 30, 1913, we think it was no less so after that date, notwithstanding the inserted memorandum. It will be noted that the em- phasis of the contract as drawn was upon the "all-steel ' tongues." The contract was something more, even, than a contract for royalty. It required the plaintiffs to enter the employment of the defendant, and to devote themselves to the development of the manufacture and sale. It bound the plaintiffs that they should not be directly or indirectly in- terested in any other company or concern, or with any other person engaged in the manufacture "of tongues of any kind." The plaintiff Hanson devoted his time to the manufacture of the all-steel *buggy* tongues in precisely the same manner that he did to the manufacture of the all-steel *wagon* tongues. Likewise, Grenard, as a salesman, devoted his services to the one line as much as to the other. Fur- thermore, if the contract were to be deemed ambiguous, it appears from the record that, for eight months, the parties put their own construction upon it. Pursuant to the con-- tract, the defendant made monthly reports of its sales. The following is an abstract of such monthly reports for the first eight months:

3. CONTRACTS : mutual con- struction.

September, 1913.
    Wagon tongues sold during said month ........$ 406.70
October, 1913.
    Wagon tongues sold ........................ 1830.94
November, 1913.
    Wagon tongues sold ............. 1778.98
    Hounds ........................ 223.37
    Buggy tongues ................. 3.50        2005.85

December, 1913.
    Wagon tongues sold ............ 1319.18
    Hounds ........................ 154.71
    Buggy tongues ................. 275.80      1749.69

January, 1914.
    Wagon tongues sold............. 1578.52
    Hounds ........................ 99.93
    Buggy tongues ................. 97.20       1775.65

February, 1914.
    Wagon tongues ................. 1654.96
    Hounds ........................ 109.35
    Buggy tongues ................. 902.50      2666.81

March, 1914.
    Wagon tongues ................. 2368.86
    Hounds ........................ 103.11
    Buggy tongues ................. 1379.55     3851.52

April, 1914.
    Wagon tongues ................1828.68
    Hounds ........................ 143.55
    Buggy tongues ................1068.35       3040.58

    It was not until May, 1914, that the defendant con-
ceived it unnecessary to make a report as upon the buggy

tongues. It is true that the foregoing reports do not report *payments* of royalty, and that the defendant never did pay a royalty for the buggy tongues. Its excuse, however, was that it would wait for the issuance of the patent. After the issuance of the patent, its excuse was that the patent was without value. If the defendant did not deem itself liable under its contract for the buggy tongues, there was no occasion for its report of the same. It does not avail it to say that the patent was not good. It was competent for it to contract to pay a royalty, even on an unpatented device. *Ingraham v. Schaum & Uhlinger*, 157 Pa. 88, 89 (27 Atl. 404, 405). Nor was it competent to the defendant to impeach the validity of the patent. *Eagleton Mfg. Co. v. West, etc., Mfg. Co.*, 111 U. S. 490; *Eureka Co. v. Bailey*, 78 U. S. 488; *Miami Cycle & Mfg. Co. v. Robinson*, 245 Fed. 556.

4. PATENTS: denying validity under royalty contract.

The stock delivered by the plaintiffs to the defendant, pursuant to the contract, included the plaintiff's sample "all-steel *buggy* tongue." This was the model upon which the manufacture of all-steel buggy tongues by the defendant was begun. We are satisfied that no other construction of this contract is tolerable than that it was intended to include the entire scope of Hanson's devices pertaining to "all-steel tongues." The defendant got the full benefit of the contract, as so construed. The plaintiffs acquired the Bolte patents at an expense to themselves of $395, and gave to the defendant the full benefit of it, free of cost. To say that this benevolence struck down their pre-existing right to royalty for the all-steel *buggy* tongues would be harsh reasoning. We hold, therefore, that the insertion of the memorandum pertaining to the Bolte patents, though it added to the benefit received by the defendant pursuant to the contract, took nothing from the right of the plain-

tiffs to recover royalty, pursuant to the contract as originally executed.

II. The appellant complains of the computation of royalties due, as being erroneous and excessive. The provision for the rate of royalty is contained in Paragraph 3. The contention of the appellant is that, inasmuch as its gross sales exceeded $10,000, it was liable only for a royalty of 5 per cent. The trial court allowed the computation on the basis of 10 per cent for the first $5,000 and 7½ per cent for the next $5,000, and 5 per cent on the excess over $10,000. The terms of the contract are not free from ambiguity at this point. They are literally capable of the construction contended for by the appellant. To so construe the contract, however, is to involve it in contradiction and absurdity. Under the clear provisions of the contract, the plaintiffs would have been entitled to royalties amounting to $875 upon sales amounting to $10,000. And yet, according to the construction contended for by appellant, if the sales were to amount to $10,001, the royalty would amount only to $500. The royalties for sales amounting to $9,000 would greatly exceed those for sales amounting to $11,000. Here again, the parties themselves put a practical construction upon the contract; and clearly disclosed their own understanding of it. On March 13, 1914, the president of the defendant company presented to the plaintiffs the following writing, as a proposed modification of the contract, and the same was signed:

5. CONTRACTS: nullifying contract or attaining absurd results.

6. CONTRACTS: mutual construction.

"Monticello, Iowa, Mch. 13, 1914.

"Special Agreement.

"On account of the wagon tongues costing more to manufacture than we estimated at the time of our original contract, dated August 7, 1913, we agree on a five per cent royalty commission in lieu of the royalty commission as

mentioned in our contract of August 7, 1913, which was ten per cent, 7½ per cent and 5 per cent. The above agreement goes into effect January 1, 1915.

"B. P. Hanson          Hall Manufacturing Company,

"L. Grenard      .      By J. S. Hall, President."

The sales of the company had already exceeded $10,000, and there was no occasion for the modification if the contract was understood by the parties as now construed by the defendant. We think, therefore, that the only reasonable construction which can be applied to the contract is that the sliding scale thereof ceased when the quantity of production reached $10,000, and that all excesses thereafter should bear a royalty of 5 per cent only.

The conclusions thus reached by us are decisive of the case on this appeal. The evidence below was undisputed. The trial court, in its instructions to the jury, adopted the construction of the contract which we have here approved, both as to the subject-matter thereof and as to the measure of recovery. The points considered are the only grounds of reversal urged. The judgment below is, therefore,—*Affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.