**HORVATH v. McCORD RADIATOR & MFG. CO. et al.**

**McCORD RADIATOR & MFG. CO. v. HORVATH et al.**

**CARRIER ENGINEERING CORPORATION v. HORVATH et al.**

Nos. 7500–7502.

Circuit Court of Appeals, Sixth Circuit.

Dec. 12, 1938.

HICKS, Circuit Judge, dissenting in part.

———◆———

Howard Streeter, of Detroit, Mich. (Howard Streeter and Wiley, Streeter & Ford, all of Detroit, Mich., on the brief), for Geza Horvath.

Frank Parker Davis, of Chicago, Ill., and George Rex Frye, of Detroit, Mich. (Swan, Frye & Hardesty, of Detroit, Mich., Frank Parker Davis, of Chicago, Ill., and George Rex Frye, of Detroit, Mich., on the brief), for McCord Radiator & Mfg. Co.

Herman Seid, of New York City (Herman Seid, Charles J. Staples, and James Abell Mills, all of New York City, on the brief), for Carrier Engineering Co.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

Geza Horvath, appellant in No. 7500 and appellee in No. 7502, instituted this action against the McCord Radiator & Manufacturing Company (appellant in No. 7501 and appellee in 7500 and 7502) seeking an injunction and an accounting by reason of the alleged infringement of a patent owned by Horvath. The McCord Company answered, denied infringement and counterclaimed, seeking specific performance of a contract whereby it claimed that Horvath agreed to execute and deliver to it an exclusive license under his patent.

On March 14, 1928, the Court enjoined Horvath from assigning, transferring or granting any interest under said patent, and on final submission, sustained McCord's counterclaim and dismissed Horvath's petition, D.C., 27 F.2d 148, which decision this Court reversed, 6 Cir., 35 F.2d 640. On remand on April 22, 1930, the lower court dissolved the injunction and found that McCord had infringed and reference was had to William S. Sayres, Special Master, for an accounting. Pending the hearing before him the Carrier Engineering Corporation, appellant in No. 7502, filed an intervening and supplemental bill in the original action, claiming it was the exclusive licensee under the patent involved and a necessary party plaintiff to a complete accounting of profits and damages and, with Horvath's consent, was so joined. The Special Master filed a findings of fact and conclusion of law and awarded to Horvath reasonable royalties of $80,334.76, together with interest of $11,347.28 and denied Carrier relief. All of the parties filed exceptions, which were overruled by the trial court except it increased interest to $18,888.26 and each has appealed.

The patent in question, No. 1,472,719, was granted October 30, 1923, to Horvath, its inventor, patentee and owner at all times pending these proceedings. He designated it a machine for making radiator tubes and claimed: "This invention relates to machines for making radiator tubes which have extended radiating surfaces made of a strip of ribbon of thin sheet metal wound spirally around the tube proper, the object being to provide a machine which is very compact in form into which the tube is fed and rotated in such a manner that a strip of thin metal will be wound around the tube and secured thereon, all in one operation."

The specifications and drawings of the patent describe in detail the parts and function of the machine and recite "other and further objects and advantages of the invention will be hereinafter set forth and the novel features thereof defined by the appended claims." These are seventy-four in number and some purport to cover a "machine" and others to cover a "method" for applying to tubing the spiral fin involved. The substance of the invention was a machine for making spiral tubing.

The accounting period involved begins June 1, 1925, and ends April 24, 1930. During this time, McCord Company sold to its customers 16,066,952.58 lineal feet of spiral fin tubing made on the infringed machines of which some was sold as tubing, some included in other products made and sold by it, and some furnished it by customers as plain tubing and equipped by it with such spiral fin and returned to them.

McCord Company received in net sales for the tubing $1,487,524.86, and the Master found that its profits were large and due solely to the infringement. He further found that Horvath's damages did not exceed the profits, and that it was impossible to determine with reasonable certainty the amount of the latter. He also found that Horvath's damages must be measured by reasonable royalties but that there was no established or uniform rate received by him from licensees. He found that under the evidence a reasonable royalty was one-half of one per cent per lineal foot of the tubing manufactured by the machines and that the infringement was not wilful. He found that on May 3, 1926, Horvath licensed his patent to Carrier for a royalty of one cent per lineal foot. Carrier was given an exclusive license to make and use the machines for the manufacture of spiral tubing for the purpose of heating, ventilating and air cooling, except that with its consent, which was not to be unreasonably withheld, the licensor could license others.

Thereafter Carrier, through its agents and subsidiary companies, sold large quantities of spiral fin tubing manufactured by the machines from which sales it realized profits in large amounts and as a result thereof built up a going, profitable business.

The Master found Carrier did not have sufficient interest in the patent to maintain a separate action for infringement or to share in Horvath's recovery. He also found that it had failed to comply with R. S. § 4900, 35 U.S.C.A. § 49, and that while it had sustained damages in some amount due to McCord's infringement, they were impossible of definite ascertainment, and any reasonable royalty found due would be payable to Horvath. He found that Horvath had notified McCord of its infringement prior to the commencement of the accounting period.

Horvath contends the award to him is inadequate and McCord insists it is excessive. If the decree is correct as to a minimum award to Horvath, McCord's appeal fails.

Horvath insists his damages under the evidence should be measured by the savings in cost to McCord of manufacturing the spiral fin tubing by his machine.

McCord admits it owes in damages to Horvath, reasonable royalties, but insists these should be based on a percentage of sales of the product of the infringed machine.

■ The fruits of the advantage to McCord, shown by direct evidence or by fair inference, of using Horvath's machine, over what it had in using other processes then open to the public and adequate to enable it to obtain an equally beneficial result, are its profits and may be allowed Horvath as damages. Mowry v. Whitney, 81 U.S. 620, 653, 14 Wall. 620, 653, 20 L.Ed. 860; Tilghman v. Proctor, 125 U.S. 136, 161, 8 S.Ct. 894, 31 L.Ed. 664; Sessions v. Romadka, 145 U.S. 29, 52, 12 S.Ct. 799, 36 L.Ed. 609; Cawood Patent, 94 U.S. 695, 696, 711, 24 L.Ed. 238.

■ The burden is on Horvath to prove that McCord made profits by the use of his patented machine, and having sustained it, McCord must then show that a portion thereof was due to the use of processes not covered by Horvath's patent, and if successful, it then devolves on Horvath to apportion the profits attributable to the use of his patented machines, or demonstrate by the weight of the evidence that such profits are so inextricably commingled as to defy apportionment. The burden then returns to McCord. Westinghouse Electric & Mfg. Company v. Wagner Electric & Mfg. Co., 225 U.S. 604, 623, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A.,N.S., 653; K. W.

Ignition Company v. Temco Electric Motor Company, 6 Cir., 283 F. 873; Western Glass Company v. Schmertz Wire Glass Co., 7 Cir., 226 F. 730.

The merits of Horvath's invention were largely a savings in the expense of material and labor entering into the manufacture of spiral fin tubing and a superior product. He was not the discoverer of spiral fin tubing. Other inventors, long his predecessors, had invented machines on which such tubing was made.

Spiral fin tubing is old to the art. It is made by attaching to a seamless tube a metal fin spirally wound secured by means of solder, its purpose being to increase radiation through the use of the fin.

In order to ascertain what substantial improvement Horvath made in its manufacture resulting in a savings, it is necessary to briefly review the prior art at the time his patent was granted. Stolp originated the first machine for making spiral fin tubing in 1902. His was an automatic machine with a carriage which moved lengthwise of it, the carriage holding a mandred or spindle, which revolved at the same time the carriage moved. The tubing was fastened to the spindle and as it turned was pulled forward in the machine and wound upon it the fin ribbon which was fed to it from crimping rolls. The loose ends of the ribbon were then fastened to the tubing and the whole dipped in liquid solder.

Later Stolp and Wright obtained two patents by which a strip of wire solder was wound around the tube at the same time as the finning ribbon and as the tubing ran lengthwise through the machine it also ran through a hot furnace and in that way the fin was soldered. The difference between Stolp's original patent and these two patents was that in the latter the solder was applied simultaneously with the fin. No license was granted under the Stolp patents but he had a stock interest in the Long Manufacturing Company which used his machines. The Stolp machines were operated with a hand crank but could be driven by an electric motor.

The Rome Turney Radiator Company has made spiral fin tubing since 1905 under a Western Electric patent which had two methods, one, the winding of the fin on the tube by hand and the other by machine. In the hand process the operator holds the copper tube in his hand and applies the fin. In the machine process the

tube is held in a horizontal position and a machine puts the fin over it. The machine then revolves the tube and spaces the fin along it. The fin tubing is removed and immersed in a bath of solder. The Rome Turney Company makes only short lengths and is operating at the present time, and is the only patent under which spiral fin tubing was produced, other than Horvath's, at the beginning of the accounting period, June 1, 1925.

There was a German patent issued in 1916 to one Herman Garbe for spiral fin tubing, not patented in the United States, but was open to public use during the accounting period involved, but no detailed description of it is found in the record, and nothing to show it was used in the United States.

Horvath built and put in operation a machine for making spiral fin tubing in 1918, and was awarded the patent in question, No. 1,472,719, October 30, 1923. The mechanism as finally patented advances the seamless tubing from a drum and at the same time crimps, spaces and attaches the fin so that any length of tubing can be finned by the one process. The plain tube is fed from a drum into the machine which has a feeding and gripping mechanism, which simultaneously advances and revolves it at the same speed as the machine. There are four synchronized mechanisms by which the ribbon is crimped, wound over the tube, and attached to the tube and liquid solder is flowed over the whole.

The Horvath machine is five and one-half feet long and two feet across and is driven by a half horse power motor. The metal ribbon for the fin is wound plain on a reel or spool and is automatically fed into the machine at the point of the crimping mechanism and after being crimped is attached to the plain tubing in a slot thereon, and is tightly wound around the tube edgewise to make the fin. The maximum speed of the machine is between 1,150 and 1,200 revolutions per minute and while the finned tube is revolving at this speed the solder is applied by paddle wheels from a solder tank over the machine which is controlled by a thermostat, the temperature of the solder being kept within fifteen degrees Fahrenheit. The gas consumption in order to heat the solder and keep it in a melting condition is four cubic feet per minute, and is previously mixed with air in the proper proportions and delivered to the burners over the solder machine.

When the tube is completed and soldered, the machine is stopped and on the feeding end is an expanding coupling which contains a right-hand and left-hand thread and the next tube is put through this coupling and the operation repeated. When the second tube passes through the end of the machine the operator disconnects the front tube and cuts the ribbon. This saves a second fastening of the tube and time, and makes a continuous operation. This machine requires but one operator, whereas Stolp's required three.

Stolp's machine was the only one available to McCord before the accounting period which describes any mechanism for the crimping and attaching of fin to plain tubing, but its advantages were limited. Horvath closely integrated by machinery all the processes for the manufacture of spiral fin tubing so that more units could be produced with less man power, with the result that efficient light-weight heating surface was inexpensively produced for use wherever heat exchange was required.

Stolp's finished tubing was limited by the length of his machine but any length could be made by the Horvath mechanism. Horvath's fin crimping device was adjustable, Stolp's was not. Horvath's soldering device permitted the use of a cheaper grade of solder which was applied more evenly than with Stolp's machine and without any risk of damage to the tube by excessive heat which existed in the Stolp mechanism. Horvath's machine was more than an improvement of Stolp's, as it wrought such changes in mechanism that to all intents and purposes he devised a new method for the manufacture of spiral fin tubing. Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330.

Horvath is a skilled mechanical engineer and inventor. On June 9, 1919, he granted to the National Can Company a nonassignable shop right to construct and put in use without the right of sale, machines embodying the invention described in his patent and was Chief Engineer for this Company from December 1, 1916, to April 30, 1924. Subsequently the National Can Company sold its assets to the National Radiator & Manufacturing Company and McCord acquired all of the assets of the National Radiator Company June 1, 1925, including the Horvath machines.

Horvath had been employed by the McCord Company in 1913 and 1914 and in 1924 began negotiations with the Com-

pany for re-employment and in connection therewith for licenses under his patent for the manufacture of tubing. He was employed January 1, 1925, as engineer at $1,000 per month and continued as such until April 30, 1926.

At the time the McCord Company acquired the assets of the National Radiator Company, Horvath had pending against it a suit for royalties, which had not been adjudicated when this action was filed. The negotiations for licenses to McCord were not consummated though McCord insisted it had acquired a license at a royalty rate of 3% of the gross profits realized from the sale of the fin tubing and in these proceedings originally the lower court, D. C., 27 F.2d 148, decided such contract had been made, which decision was reversed by this court, 6 Cir., 35 F.2d 640.

McCord operated the patented machines in the old location for seven months after acquiring the assets of the National Radiator Company, and then moved them to its plant and built and put in operation five additional ones.

The National Radiator & Manufacturing Company's principal business was the manufacture of automobile radiators, the production of fin tubing being incidental. About the time of the negotiations between Horvath and McCord, the demand for spiral fin tubing greatly increased, due to the development of mechanical refrigeration.

McCord insisted at all times until it filed an answer in this action, that it had some right to use the machine under the shop license Horvath had issued to the National Can Company June 9, 1919, which Horvath disputed. On August 13, 1926, McCord tendered to Horvath $5,385.54 which it claimed was due him as royalties at the rate of 3% on gross sales of spiral fin tubing manufactured on his machine and subsequently tenders were made for additional royalties on this basis, which Horvath declined.

■ This case is not one where the defendant has inadvertently infringed the rights of the patentees; on the contrary McCord used Horvath's machines with full knowledge that it owed him royalties and that its liabilities were to be measured either by its gross profits realized from the sale of spiral fin tubing made on the machines or that it became indebted to Horvath for all of the profits realized by use of the patented device. Under such circumstances McCord carried the burden of so keeping its records that an accurate account could be made to Horvath of the profits. Brennan & Co. v. Dowagiac Mfg. Company, 6 Cir., 162 F. 472.

■ Under this state of facts, every doubt and difficulty in accounting will be resolved against McCord and it carries the burden of separating or apportioning the profits made by it between Horvath's patented machine and other methods of manufacture. Yesbera v. Hardesty Manufacturing Co., 6 Cir., 166 F. 120.

The parties submitted to the Master, the lower court and on this appeal two methods and alternatives for determining damages. Horvath insisted that his damages should be determined by the savings in cost to McCord of manufacturing spiral fin tubing on his machines compared with the use of the Stolp machine, and as an alternative by established royalties which he claimed were proved by his license agreement with Carrier for one cent per lineal foot.

McCord insisted that the damages should be measured by its statement of profits as determined from its books of account which showed net $59,899.54, or as an alternative, three per cent of its gross sales established as a rate of royalty by Horvath's offer to McCord to license on that basis.

■ The exceptions of the parties to the Master's report all raise questions of fact which, when correctly determined, fall within undisputed principles of law, so at the outset we are confronted with deciding to what extent the court is empowered to re-examine the findings of the Master when approved by the District Judge. There is no doubt that the court has power to set aside the report of a Master for manifest error either of law or fact, and to recommit the cause to him for further proceedings or to correct his errors if the means of so doing are found in the record.

■ The findings of a Master or the district court are presumptively correct and cannot be assailed unless an examination of the record shows that the Master or the lower court made no specific findings of fact in reference to the precise issues or the physical facts demonstrate the unsoundness of the facts found or if the Master or court manifestly misapprehended the evidence or went against its clear weight, or applied an erroneous rule of law which was necessary to the making of the fact find-

ings.   Uihlein v. General Electric Co., 7 Cir., 47 F.2d 997, 1001.

■■■ In considering equity cases on appeal, the court must give much weight to the finding of the Master or district court on disputed issues. However, we are not required to accept such findings in the same sense that we accept the verdict of a jury in an action at law respecting an issue over which there is a dispute, and if on the whole record the evidence decidedly preponderates against the findings of the Master, the reviewing court is not bound by them.  Vandenburgh v. Truscon Steel Co., 6 Cir., 277 F. 345; Uihlein v. General Electric Co., supra; Roosevelt v. Missouri State Life Insurance Co., 8 Cir., 78 F.2d 752; Boesch v. Graff, 133 U.S. 697, 705, 10 S.Ct. 378, 33 L.Ed. 787; Denver v. Denver Union Water Co., 246 U.S. 178, 198, 38 S.Ct. 278, 62 L.Ed. 649.

■■ The report of the Master made no specific findings of fact with reference to the precise issues raised by the parties. He made no finding as to the nature of the invention involved, its utility and advantages, the value and extent of its use and the savings, if any, by reason of its use over other available methods of making spiral fin tubing.  He also failed to find what license agreements, if any, Horvath had made for the use of his invention and failed to approve or disapprove McCord's account of profits.  He did not find as a fact that Horvath was enjoined on McCord's petition from assigning, transferring or granting any interest under his patent from March 14, 1928, to April 22, 1930. He failed to find any fact in support of his conclusion that the sum of one-half of one cent on each lineal foot of spiral fin tubing was a reasonable royalty.

The Master's report is merely an expression of an opinion as to what he believed should be the award to Horvath and falls clearly within the rule of condemnation of a Master's finding laid down by the Supreme Court in the case of Morimura, Arai & Co. v. Taback, 279 U.S. 24, 34, 49 S.Ct. 212, 73 L.Ed. 586, and should be disregarded.

■■ The error of procedure, however, does not necessitate sending the case back to the district court.  It has been pending more than ten years and should be decided.   The issues were fully heard before the Master and all evidence tendered by the parties was admitted.  The exceptions taken to his findings raise no serious question of fact and we have before us in the

record the evidence and all other materials necessary for judgment.  The district court made no findings of fact but adopted the report of the Master.  Therefore, we proceed to do what the district court should have done, namely, consider the report, pass upon the exceptions and make such decree as is equitable in the premises. Denver v. Denver Union Water Company, supra; Clark v. Schieble Toy & Novelty Company, 6 Cir., 248 F. 276, 282.

In compliance with the requirements of the Master's summons, McCord filed a report taken from its records and books of account of its alleged gains from the use of Horvath's invention.  It had kept no accounts separate and distinct from its general business showing its profits and gains from the manufacture and sale of spiral fin tubing.  It was able to accurately report gross sales from tubing for the entire accounting period, which showed $1,487,524.86 and the number of lineal feet which was 16,066,952.58.  There was a constant increase in sales ranging from $128,734.69 in 1925 to $432,289.95 in 1929, with a sharp drop to $80,834.38 in 1930.  The cost of sales is not so satisfactorily determined as the gross because there was an intermingling of deductions with sales of other products of the Company.  Its account shows a manufacturing cost for the whole period of $1,217,172.90 which ranged from $93,934.50 in 1925 to $372,102.69 in 1929, with a decline to $67,537.48 in 1930.

According to the account, McCord enjoyed a manufacturing profit for the whole period of $270,351.96 which ranged from $34,800.19 for the seven months' operation in 1925 to $60,187.26 in 1929, falling to $13,296.90 for the four months' operation in 1930.

The declines in 1930 are attributable to the general financial depression and business recession of which the court may take judicial notice.

McCord, in its accounts, deducted against its manufacturing profit, commercial expenses, made up of executive salaries, general office salaries, accounting, department salaries, traveling expenses and various other items including depreciation, taxes and insurance, the maintenance of branch offices and group insurance premiums, totaling $652,886.03, out of which it apportioned on a basis of relative cost of sales, $112,811.55 to the spiral fin tubing department.  After deducting returns and allowances from gross sales, McCord had net sales from all of its business of $55,-

751,324.20. Included therein was $1,487,-524.86 net from spiral fin tubing.

The manufacture of spiral fin tubing was only an incident to McCord's business and it is clear from the evidence that this did not materially add to its commercial expenses. Enterprise Railway Equipment Company v. Wine Railway Appliance Company, 6 Cir., 77 F.2d 159.

In any event, it is impossible to segregate the particular items of commercial expenses to the infringing business and they are not proper deductions from manufacturing gain. Levin Bros. v. Davis Manufacturing Co., 8 Cir., 72 F.2d 163.

There was also deducted in the account in arriving at net profit $52,092 for franchise taxes, corporate expenses, employees' bonuses, executive bonuses, capital stock tax, amortization of machine costs, bad accounts, interest on bonded indebtedness, borrowed money, remodeling, experimental and development expenses, which were apportioned to spiral fin tubing on a basis of gross sales.

There is nothing in the record to show that these particular expenses were incurred in acquiring the infringing machines or in producing their product, and they are not an allowable deduction for the reason stated in the paragraph immediately above.

There was also deducted in the account $31,924.13 interest on invested capital. McCord had an average invested capital for the infringing period of $19,895,958.06. This sum was apportioned on relative gross sales, which showed invested capital attributable to the spiral fin tubing department of $532,068.83.

Interest is only allowable on the capital investment actually used wholly or in part in producing and marketing the infringing product, and the burden rests on the infringer to produce evidence which will enable the court to satisfactorily apportion it between the several kinds of businesses. Westinghouse Electric & Mfg. Company v. Wagner Electric & Mfg. Co., supra; Seabury v. Am Ende, 152 U.S. 561, 570, 14 S.Ct. 683, 38 L.Ed. 553; Kissinger-Ison Company v. Bradford Belting Company, 6 Cir., 123 F. 91. Under this rule McCord was not entitled to deduct any sum as interest on capital investment employed in the manufacture of spiral fin tubing.

McCord shows a net profit in its stated account of $59,899.54. If there is added to it the items of deduction herein disallowed, its net profits would be $256,727.22.

The science of cost accounting is so inexact at best and theoretical allocations of deductions between different branches of a business so inaccurate that McCord's report is a poor guide for estimating allowable damages to Horvath.

Horvath has not availed himself of his patent rights by granting sufficient licenses nor are his license fees of such uniformity as to prove his damage by established royalties (Rude v. Westcott, 130 U.S. 152, 167, 9 S.Ct. 463, 32 L.Ed. 888) but he has made contracts which throw some light on reasonable royalties to be allowed him considering the nature of his invention, its utility and advantages and the extent of its use. Alliance Securities Company v. De Vilbliss Mfg. Co., 6 Cir., 76 F.2d 503. He made application for the patent in question June 5, 1919, and on June 9, 1919, granted to the National Can Company a shop right to manufacture and use the machines as described in the patent in its own business, without authority to sell or lease them. He was also employed by this company as its Chief Engineer at a salary of $300 per month and royalties of 5% on the gross sales of the finished product, which royalties were not paid and he instituted suit for an accounting, the disposition of which is not shown in the record.

On July 17, 1924, the Harrison Radiator Corporation, Lockport, New York, made a tentative proposal in writing to Horvath offering to employ him as engineer at a salary of $1,000 per month in connection wherewith he was to assign to it the patent here in question and one other and was to receive as royalty five per cent of the gross sales realized from the products made on the machines.

On January 2, 1925, Horvath agreed to grant McCord an exclusive right to the use of the patent in suit here, No. 1,472,719, on a royalty basis of 3% of the gross sales, excepting the right theretofore granted to the National Can Company. However, as a part of this offer McCord was to employ Horvath at a salary of $1,000 per month, his duties to be engineering, technical and scientific development of McCord's line of business to which all of his time was to be given. McCord was to establish a special research department over which Horvath was to have charge and he was to deal with and report directly to McCord.

Under the agreement as outlined in the correspondence McCord Company was also to have the exclusive right to manufacture spiral tubes from a ribbon under patent No. 1,294,465 of which Horvath was the sole owner if it so decided in a reasonable time in which event it was to pay a royalty of 5% upon the gross sales which 5% was not to exceed 15% of the net profits upon the business.

It was agreed that on a new type of cellular radiator then being developed by Horvath, McCord within a reasonable time was to have the exclusive right to manufacture thereunder on the payment of 10 cents per radiator. On any ideas along the lines of McCord's business that were patented by Horvath while acting under this agreement, McCord was to have the exclusive right to use such development or inventions, which were to be assigned to it, other than those outside the United States and Canada.

Before operations were to be started under patent 1,472,719 here in question, a formal legal contract was to be executed between McCord and Horvath, which was not done.

On May 3, 1926, Horvath granted the Carrier Engineering Corporation a license under patent No. 1,472,719 in suit, and improvements for the purpose of heating, ventilating and air cooling, for which Carrier was to pay a royalty of one cent per foot, which agreement was to remain in force for the term of the patent, or any improvements thereon.

McCord's expert, John H. Parsons, testified that one per cent of the gross sales was a reasonable royalty to Horvath for the use of his machines.

Parsons was an experienced production engineer but had no practical knowledge of the manufacture of spiral fin tubing and knew but little of the technique of its production. He said he thought Horvath's machine was "just another way" of making spiral tubing.

Horvath's expert, Edward S. Lea, mechanical engineer since 1885, testified that on an exclusive license from one to five cents a foot was a reasonable royalty. He said on a nonexclusive license "a man might be tickled to death to get one per cent royalty on something, and think he was getting off easy, another case he might want ten per cent and be justified in demanding it." He also stated "there is no rule for royalties." He stated he had investigated the Horvath patents and all other methods and processes for the manufacture of spiral fin tubing and that he had found nothing comparable to Horvath's method as to quantity, quality or price.

John Sneed, inventor and consulting engineer, said that assuming, first, that spiral fin tubing was an old and unpatentable product and there had been a patent on it now expired and, second, that it had been manufactured on machines developed prior to the patent in suit and sold to the public as spiral fin tubing, that in his opinion one and one-half per cent of the net sales price was a reasonable royalty. He said, however, that ordinarily royalty rights to the inventor should bear a certain proportion to the profits made by the manufacturer and that the inventor was entitled to a "proportion ranging from probably ten per cent of the net profits to as high as thirty per cent" which should be graduated by the competitive situation. He was not familiar with the tubing made on Horvath's machine or any other machine.

This case presents many difficulties. No basis is in the record on which to award Horvath the precise amount of profits to which he is entitled. It is likewise impossible to formulate a decree against McCord as to profits without the hazard of injustice. These handicaps are due to the incomplete state of the evidence as to the savings in cost of manufacture with Horvath's machines. McCord is an infringer and the burden must be placed upon it as a wrongdoer and it is the duty of the court to find for Horvath with reasonable approximation that to which he is entitled and in so doing, there is no duty to exercise meticulous care to avoid a hardship on McCord. Sinclair Refining Company v. Jenkins Petroleum Process Company, 289 U.S. 689, 700, 53 S.Ct. 736, 77 L. Ed. 1449, 88 A.L.R. 496.

This case is one for a reasonable royalty under Section 70 of Title 35, United States Code, 35 U.S.C.A. § 70. In fixing damages on a royalty basis against an infringer, the sum allowed should be reasonable and that which would be accepted by a prudent licensee who wished to obtain a license but was not so compelled and a prudent patentee, who wished to grant a license but was not so compelled. In other words, the sum allowed should be that amount which a person desiring to use a patented machine and sell its product at a reasonable profit would be willing to

pay. Merrell Soule Co. v. Powdered Milk Co., 2 Cir., 7 F.2d 297; Austin-Western Road Machinery Co. v. Disc G. & P. Co., 8 Cir., 291 F. 301; Egry Register Co. v. Standard Register Co., 6 Cir., 23 F.2d 438; U. S. Frumentum Co. v. Lauhoff, 6 Cir., 216 F. 610.

The property loss of a patentee from infringement may arise from such varying facts and circumstances that each case must be controlled by those peculiar to it and except in rare instances the loss can only be determined by reasonable approximation. Clark v. Schieble Toy & Novelty Company, supra. In every case, the court should sift the evidence and place its determination of reasonable royalties on something tangible if it can be found in the record in order to avoid an arbitrary conclusion.

The infringement here was committed some time after the issuance of the patent, and the machine described in it had been for many years in use. Expert testimony to be of value must yield to or agree with actual experience of the patentee and other users of the patented device and the damage allowed to Horvath must find its premise in the use to which his machine has been put and the benefits enuring to its users. Sinclair Refining Company v. Jenkins Petroleum Process Co., supra.

When McCord acquired the assets of the Radiator Company it did not expect to engage extensively in the manufacture of spiral fin tubing. According to its report of profits, its total net sales on all of its products were $55,751,324.20 compared with only $1,487,524.86 from spiral fin tubing. The manufacture of tubing was only a small part of McCord's business. Its use of the patented machines does not prove their true worth nor their potential market.

During the infringing period, Horvath entered into the contract with Carrier for a royalty of one cent per lineal foot, which has since continued.

After giving fair appraisal to all the evidence, which includes McCord's statement of profits, testimony of expert witnesses, licensing agreements entered into by Horvath and offers made to him for the use of his patent, we find a reasonable royalty rate for the use of his invention is three-fourths of a cent per lineal foot of the spiral fin tubing manufactured by McCord on the infringing machines or an award of $120,502.11. Tilghman v. Proctor, supra.

The lower court found McCord was not guilty of conscious, deliberate infringement and we are of the opinion it did not abuse its discretion in so finding. Topliff v. Topliff, 145 U.S. 156, 174, 12 S.Ct. 825, 36 L.Ed. 658; Clark v. Schieble Toy & Novelty Company, supra.

The decree of the district court was entered before the decision of the Supreme Court in Duplate Corporation v. Triplex Safety Glass Company, 298 U.S. 448, 460, 56 S.Ct. 792, 80 L.Ed. 1274. Applying here the rule approved in that case, interest on the award should be calculated at the rate of five per cent from January 7, 1935, until paid. The decree in No. 7500 should be modified in accordance with this opinion and as modified affirmed and the cross appeal in 7501 is affirmed.

In 7502 the Carrier Engineering Corporation claims that its license with Horvath was exclusive for a part of the invention and that it, as well as Horvath, has been injured by the infringement of McCord and it is entitled to recover damages under R.S. § 4921, 35 U.S.C.A. § 70. McCord insists that in no event is Carrier entitled to recovery because of its non-compliance with R.S. § 4900, 35 U.S.C.A. § 49.

Horvath's action was filed February 8, 1927, and he granted the license to Carrier, May 3, 1926. Carrier contributed to the cost of four machines built by Horvath upon the base of each of which was cast the following marking: "Patented October 30, 1923. Other patent pending." These machines were moved into the Carrier plant in 1926 and have since remained there. Thereafter, during the infringing period, Carrier built three machines, without markings, and installed them in the same room with the others and manufactured tubing on all of them. The room had two entrances, one, locked and the other with a sign "no admittance." No patent markings with reference to Horvath Patent 1,472,719 were placed on the tubing produced by the machines or on the packages containing them.

When the lower court in 1928 decided that McCord had an exclusive license, Carrier discontinued the payment of royalties to Horvath, having at that time had actual notice of the pendency of Horvath's suit against McCord, but did not notify McCord of its claim for damages until March 21,

1931, after the accounting period had expired, and after McCord had discontinued the use of the Horvath machines. Its supplemental bill in this action was filed June 16, 1931, and it is therein alleged that it had therefore given actual notice to McCord of its exclusive license from Horvath.

Revised Statutes, § 4900, 35 U.S.C.A. § 49, makes it the duty of all patentees, their assigns or legal representatives and of all persons making or vending any patented article for or under them to give sufficient notice to the public that the same is patented either by affixing thereon the word "patented" together with the day and the year granted or, when this cannot be done, by affixing to the article or to the package wherein one or more is inclosed, a label containing a like notice. Unless this is done, no recovery can be had for damages by reason of infringement except on proof that the defendant was duly notified of his infringement and continued thereafter to make use of or vend the articles so patented.

The language of the Statute applies not only to patentees but to their assigns, and its purpose is to prevent innocent infringement. Enterprise Railway Equipment Company v. Wine Railway Appliance Company, supra.

Carrier's ground for relief, if any, is confined solely to its pleadings. Dunlap v. Schofield, 152 U.S. 244, 250, 14 S.Ct. 576, 38 L.Ed. 426. It alleges in its supplemental bill as a prerequisite to recovery that it had theretofore given to McCord actual notice of its infringement and of Carrier's exclusive license under the letters patent granted to Horvath and of its claim for damages and profits against McCord by reason of its infringement. It makes no claim in its pleading of rem notice to the public, nor does it rely on Horvath's notice of his rem markings. It introduced in evidence patent markings and argued in its brief that notice by Horvath to McCord relieved it of its statutory duty.

A cause of action for damages or for an accounting for profits in a patent suit is not stated unless it be alleged that by marking of the patented articles or by personam notice to the defendant, the plaintiff has complied with Revised Statutes, § 4900, 35 U.S.C.A. § 49, and such cause of action is not proved unless it be shown at the trial that such marking occurred or such notice was given before the suit was brought. Franklin Brass Foundry Company v. Shapiro & Aronson, Inc., 3 Cir., 278 F. 435.

In the presence of the great mass of accumulated and growing litigation with which the courts are now burdened, every just and reasonable means to simplify and narrow the issues in controversy should be used and the well-recognized principle that the allegations of the pleadings and the proofs must agree should be enforced. Washington, A. & G. Railroad Co. v. Bradley, 77 U.S. 299, 303, 10 Wall. 299, 303, 19 L.Ed. 894; In re McEwen's Laundry, 6 Cir., 90 F.2d 872.

No question was raised by McCord in the lower court as to variance between the pleadings and proof. We do not intend to weaken the principle that objections not taken in the court below will not be allowed in this court but when the variance is plain, as here, we think it fatal and the court should not ignore it.

Horvath, in his original petition, relied on personal notice to McCord of its infringement and made no statement of his alleged assignment or license to Carrier. In its intervening petition, Carrier relied on its separate notice to McCord. Neither Horvath nor Carrier relied on the statutory public notice by the stamping of the machines.

The Master found that Carrier had not complied with the provisions of R.S. § 4900 and the lower court sustained him and there is no substantial evidence in the record which would warrant disturbing this finding. Compare Dunlap v. Schofield, supra; General Electric Company v. George J. Hagan Company, D.C., 40 F.2d 505; Trussell Mfg. Company v. Wilson-Jones Company, 2 Cir., 50 F.2d 1027.

Judgment is affirmed in No. 7502.

HICKS, Circuit Judge (dissenting in part).

I think that the concurrent finding of the Master and Court of the amount that should be allowed Horvath as reasonable royalty should be affirmed.